IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MICHAEL HACKLEY, et al. | : |
|     Plaintiffs, | : |
| vs. | :    JFM 02 CV 3363 |
| LVL X, INC., et al. | : |
|     Defendants. | : |

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR RULE 16(f)
SANCTIONS AND THEIR OPPOSITION TO AMEND THE SCHEDULING ORDER

Defendants LVL X, Inc., John Lee, and Jeffrey Way respectfully submit this memorandum of points and authorities in support of their motion for Rule 16(f) sanctions and in support of their opposition to plaintiffs' motion to amend the scheduling order, stating that:

At all times during this litigation plaintiffs have requested equitable relief in the form of an injunction *(paragraph 43)* and restitution damages *(paragraph 45)* and were therefore required to "be frank and fair with the court" and to place "everything that tends to a full and fair determination of the matters in controversy" before this Court. *Keystone Co. v. Excavator Co., 290 U.S. 240, 244 (1933).* As shown below, however, plaintiff improperly invoked the Fifth Amendment and also refused to testify about alleged damages. Plaintiff also disregarded this Court's scheduling order by refusing to attend a settlement conference by the cut-off date.

Properly under consideration is defendants' affirmative defense that defendant LVL X, Inc. had a right, either by its actual ownership of, or by having an irrevocable non-exclusive right to use, the "accused" drawings for the intended purpose: to construct a shopping center store in the space leased from Prince George's Plaza ("PGP"), in that LVL X, Inc. paid plaintiffs for, or for the right to use, the PGP drawings. The Fourth Circuit has recognized one's irrevocable nonexclusive right to use drawings for its intended purpose. See, analysis in *I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996)* citing *Avtec Sys., v. Peiffer, 21 F.3d 568, 574 n. 12* and the 4th Circuit's recognition of this theory and of *3 Nimmer Sec. 10.02[B][5]*.

The agreement[1] between Hackley and LVL X did not contain any A.I.A. language that specified the ownership, nor that restricted the use, of the drawings. *Exhibit 1*. To the contrary, their agreement simply provided for the termination of plaintiff with no restrictions or reservations whatsoever. Also, although not legally necessary, Hackley did not claim ownership of the PGP drawings by using a "©". Plaintiff admits in one of his letters *(Exhibit 2)* and at his deposition, that his contract and/or conduct likely created a misunderstanding between himself and LVL X as to who owned the PGP drawings.[2] Any misunderstanding should be construed against Hackley because he drafted the agreement between himself and LVL X and, furthermore, Hackley left the customary A.I.A. language out of their agreement.

With its $10,000 check *(Exhibit 3)*, defendant LVL X paid Hackley the remaining $7,500 balance for the PGP drawings (and for many other items). *Exhibit 4*. Hackley contends that the payment was for the $8,000 "electronic drawing" or rendering (and for other items).

---

[1] Hackley's deposition, page 303 (lines 5-7), page 129 (lines 1-4) and page 130 (18-20):
Q: You wrote the contracts, the contract proposals, Exhibit Number 30; isn't that right?
A: Yes.
Q: And would it be fair to say that these proposals represent an understanding between … you and Level X?
A: Yes.

[2] Hackley's deposition, page 301 (lines 12-22); page 302 (lines 1-7):
Q: I'd like to direct your attention to paragraph 3: "Be advised that there may be a misunderstanding here. We never "sell" drawings to clients. My clients do not own our drawings. Our clients pay for our professional service, not drawings. These drawings were developed and prepared as "instruments of that professional service." These drawings were developed and prepared as "instruments of that professional service" and are released only to be used by contractors to execute a specific project design in one specific location. Contractors may use our drawings with my permission for pricing and the actual construction of a particular tenant space."
Now Mr. Hackley, so there could have been a misunderstanding about ownership of drawings; isn't that correct?
A: I guess there could be a misunderstanding.
Q: Because the AIA wants architects to put in their contract document who owns the drawings between the architect and the owner; isn't that right?
A: I do not know what the AIA's opinion on that is.
Q: How long have you been an architect?
A: I've been an architect for 23 years.
Q: You've never heard the AIA or some of the professional organizations, let's say, want architects such as yourself to put in their contracts between themselves and … a client who owns the drawings?
A: Of course I've heard of that, but it's not necessary because I own the drawings whether I make that statement or not.
Q: Well, there could be a misunderstanding on that, right, as you state in this letter?
A: Could be a misunderstanding but that doesn't mean I don't own the drawings.

2

However, on 05-08-02, LVL X, through Lee, asked Hackley for a break down of the "64 hours at $125 per hour" rendering invoice *(Exhibit 5)*. One reason LVL X requested it was because LVL X was supposed to be billed for the draftsman[3] at a lower rate. *Exhibit 1, page 2.*

LVL X's suspicions were accurate. Hackley testified at his deposition that he had no time records to support his rendering (electronic drawings) invoice.[4] The draftsmen, John Chalk, testified that Hackley never even asked him (Chalk) for the number of hours that he had spent working on the rendering. *Exhibit 6, paragraph 13.* Hackley, himself, also reluctantly admitted at his deposition, that he did not ask Chalk for his time. Further, Hackley could not testify to how much time he, himself, had spent on the rendering. However, it is to this fraudulent invoice that Hackley seeks to allocate LVL X's payment for the PGP drawings.

---

[3] Hackley deposition, page 218 (lines 6 through 10) and page 82 (lines 4 through 11):
Q: You're saying Mr. Chalk is a draftsman on the rendering as well? A: Yes.
Q: Now, as an architect, you do not use Auto CADD or any computer-aided design packages; do you?
A: I personally do not use an Auto CADD program.
Q: Or any other computer-related design program?
A: Correct.

[4] Hackley's deposition, page 228 (lines 1 through 22) and page 229 (lines 1 through 19):
Q: Did you destroy the time records you said you have?
A: I've never destroyed any time records.
Q: Where are they?
A: **I have no time records.** The invoice is my record of time.
Q: That's the only record of your time –
A: Yes.
Q: That's the only record of your time that you ever made for this job is that invoice saying 64 hours?
A: Yes, sir. He got a very good product and got it for a good price.
Q: You never asked John Chalk, as he states in his Affidavit, for his time; isn't that correct?
A: John didn't give me his exact hours. I think he just gave me the price he wanted, how much he wanted for his time, so I assume he did his own number of hours. I just estimated that for the amount of money that he wanted and I put my hours into it, and that's the price I came up with.
Q: What part of the 64 hours are you claiming are his hours and your hours?
A: I don't remember exactly. This has been a year.
Q: But some of them are his hours and some of them are your hours?
A: Some of them are his hours and some are my hours.
Q: And you don't know?
A: At this moment I don't know. This has been a year ago and your client has cheated me out of this for a whole year. I haven't gotten paid for this.
MR. JOHNS: I move to strike that as non-responsive.
Q: So you expect my client to pay you for something that you don't even have any records for as to time, dates, anything; isn't that correct?
A: My record is my invoice, and I've been asked and I've answered that.

Hackley, himself, acknowledged to Chalk by telling him that LVL X had paid him for the PGP drawings and had not paid for the rendering. *Exhibit 6, para. 13*. Chalk also testified that, in accordance with their course of dealing, Hackley would pay Chalk for his work on a project when Hackley got paid for the project.[5] Hackley refused to produce the check which he used to pay Chalk for his work on the PGP drawings, but then capitulated. *Exhibits 7*.

Hackley's own 06-07-02 letter evidences his agreement to apply LVL X's $10,000 payment to the PGP drawings, and not to the rendering. Therein, he lists the rendering, and not the PGP drawings, as being unpaid.[6] *Exhibit 8*. Plaintiffs induced LVL X to pay them $10,000 by representing to LVL X that its check was for the PGP drawings and other invoices. Hackley does not deny that he now has an attorney to collect the rendering invoice.[7]

Hackley also delivered the rendering late, after LVL X had already constructed two of its stores with the alleged "new design image". LVL X therefore no longer needed a detailed

---

[5] Chalk's deposition, page 59, line 10:
"The deal I had with Michael was when he got paid, I got paid."
Hackley's deposition, page 136, lines 6-8:
Q: … [H]ave you paid John Chalk for the rendering? A: No.

[6] Hackley's deposition, page 383 (lines 18 through 22) and page 384 (lines 1 through 11):
Q: Mr. Hackley, you've been handed Exhibit 37. It's a letter dated June 7th. We talked about it earlier.
A: Yes.
Q: Just to recap for the time line that we're trying to create, just in two sentences what is this?
A: This is a letter directed to John Lee at Level 10 about his substantial outstanding invoices and it's particularly in reference to a phone call he made to me on the 6th. I wrote the letter on the 7th. The first sentence says that -- actually in the second sentence it says: Just so there's no misunderstanding, be advised that we do require payment in full for all of our outstanding invoices that now total $14,283.09.

[7] Hackley's deposition, page 300 (lines 17 through 22) and page 301 (lines 1 through 5):
Q: You still have an attorney-client relationship with Mr. Dore; is that correct?
A: Correct.
Q: He's retained to collect money for the rendering, correct?
A: I have an attorney-client relationship with him.
Q: For that purpose?
A: Maybe for that purpose and other purposes.

"sketch", than Hackley provided (*Exhibit 9*), to see how the new design image would look.[8] After all, once a store is built, a picture of it suffices better and cheaper than a rendering.

LVL X rightfully did not trust Hackley or his invoices especially after Hackley refused to provide LVL X with a break down, and again after Hackley withheld LVL X's chandelier. Hackley's billings and behavior became increasing more erratic after Hackley had learned that LVL X was not going to retain him as its architect for its next store at Paramus Park.

Attached is *Exhibit 10,* Hackley's "Supplemental Response to Interrogatory Number 10" (Deposition Exhibit 1) wherein Hackley admits that LVL X paid for the chandelier and that he withheld it to attempt to coerce LVL X into paying him money. Hackley knew that LVL X urgently needed its chandelier.[9] The day after Hackley withheld LVL X's chandelier, LVL X had no choice because of time constraints but to pay for another chandelier all over again and thereafter LVL X no longer needed the chandelier that Hackley stole. Hackley left

---

[8] Hackley's deposition, page 233 (lines 12 through 22) page 234 (lines 1 through 18):
Q: The storefronts of the trio, talking about Annapolis, Tysons and PGP, are those adequate for prospective landlords to view on the Internet or otherwise?
A: How would they view them on the Internet?
Q: Well, I'm just asking you a question. If they could, are they adequate?
A: I would suppose if there were pictures of them, maybe. At that time that we did this, we didn't have these built I don't think.
Q: So none of the trios were built at the time; is that right?
A: I don't think so. I think that's probably the reason he asked me for these. I didn't ask John Lee if he wanted me to do these. John Lee asked me to do this for him.
Q: So now the story is this was ordered prior to the trio stores being built?
A: I don't remember the exact time frame and I've testified to that.
Q: And you -- so you delivered this after two of the stores were built; isn't that correct?
A: I delivered it probably shortly before the date of the invoice, as I've testified already.
Q: So wouldn't a better price for Mr. Lee have been just to take a picture of a storefront and put that on the Internet? Isn't that cheaper than $8,000?
A: John Lee asked me to do this for him. I didn't request what he wanted.

[9] Hackley's 06-16-2003 deposition: page 161 (lines 3 through 9):
Q: So your testimony is that you do recall that it was a very tight time schedule to get the store open; is that correct? A: All the stores had a tight time schedule. Q: I'm talking about for Tyson's Corner. A: Well, yes.

out of his alleged "complete"[10] statement that he refused to give the chandelier to LVL X when Reece went to pick it up. See, and compare: Hackley *Exhibit 10* with Reece *Exhibit 11*.

Hackley also left out of his statement which invoice he believed to still be outstanding when he withheld LVL X's chandelier (rendering or the PGP drawings invoice). *Exhibit 10.* And, each time defense counsel lead Hackley into this area of inquiry, Hackley flatly refused to answer by improperly invoking the Fifth. Counsel sought an admission that Hackley withheld the chandelier to get LVL X to pay him for the rendering, *a fortiori,* LVL X had paid him for the PGP drawings.[11] By improperly invoking the Fifth, Hackley unfairly prejudiced defendants' attempt to further show that LVL X had paid Hackley for the PGP drawings.[12]

---

[10] Hackley's 06-16-2003 deposition, page 9 (lines 11 through 22), page 10, page 11 (1 through 8):
Q: Mr. Hackley, I'm going to hand you what's been marked as Exhibit Number 1, Defense Exhibit Number 1, for the deposition … It's a supplement to your first set of interrogatory answers. I would like you to review your … supplementary response to interrogatory number 10, please, and let me know when you're done.
Q: Do you understand the interrogatory answers are given under oath?
A: Yes.
Q: And, you gave this interrogatory under oath; is that correct?
A: Yes.
Q: Do you solemnly declare and affirm under the penalties of perjury and upon personal knowledge that supplementary response to interrogatory no. 10 is true, correct, and complete?
A: To the best of my knowledge.
Q: To the best of your personal knowledge or to the best of just your knowledge?
A: I don't understand the difference.
Q: Personal knowledge means what you state in there you personally observed, witnessed, heard, or otherwise sensed personally.
A: Yes. Yes.
Q: So your answer is that … this is made under the penalties of perjury and upon personal knowledge that this is true, correct, and complete; is that correct?
A: As far as I know, yes.

[11] Hackley's deposition, page 163 (lines 1 thru 4) and page 197 (lines 3 thru 9):
Q: By withholding LVL X's chandelier under a tight time schedule to open, you were trying to cause them to pay money that they didn't think they owed you; isn't that correct?
A: I'm not going to answer any questions [a]bout the chandelier.
Q: And … withholding their chandelier, it didn't cause them to pay you money that they didn't think they owed you; isn't that right?
A: I'm not going to answer any questions about the chandelier.
Q: Based on what?
A: Fifth Amendment.
Q: Well, you withheld their chandelier to try to get them to pay you money; isn't that correct?
A: I'm not answering any questions about the chandelier.
Q: Based on what?
A: The Fifth Amendment.

6

Hackley clearly waived his Fifth Amendment privilege on matters relative to Hackley withholding LVL X's chandelier to coerce LVL X into paying him money. Hackley had already submitted a supplemental interrogatory answer number 10 on this and related matters. *Exhibit 10.* He had also already answered questions about his supplemental interrogatory answer number 10.[13] And, Hackley repeatedly declared that he never stole the chandelier.[14] Saying that Hackley did not waive the Fifth is clearly without any factual[15] or legal[16] basis.

Because Hackley improperly refused to testify, defendants seek sanctions, through Rule 16(f), establishing that LVL X paid plaintiffs for the PGP drawings and that Hackley wrongfully withhold LVL X's chandelier to coerce it into paying him money it didn't owe.

---

[12] Hackley told Chalk he was going to pull LVL X's PGP permit because it didn't pay him for the rendering. *Exhibit 3 (para. 13).* Hackley did so because withholding LVL X's chandelier didn't work.

[13] See foot note 10.

[14] Hackley's deposition, page 247 (lines 14-16); page 264 (lines 8-13); and page 281 (lines 16-20):
Q: You stole his chandelier; then you extorted him and submitted a false bill --
A: I did not steal anything from anybody.
Q: And they were afraid you were going to try to extort them like you stole their chandelier; that's why they did it, right?
A: I never stole anything and I never extorted anything.
Q: What you call fraudulent was mitigation of damage by the defendants because you stole his chandelier, and you were going to go after the permit next, and that's what you did.
A: Absolutely untrue, false.

[15] Hackley's deposition, page 156 (lines 6 through 22) and page 157 (lines 1 through 8):
Q: You already have answered questions about the chandelier, and you have to answer any questions that I ask.
A: I refuse to answer any questions about the chandelier.
Q: On what grounds are you basing your refusal?
A: Fifth Amendment.
Q: No, you already waived it. You've already answered questions about it.
A: I refuse to answer any more questions.
MR. JOHNS: … He's waived any Fifth Amendment privilege he's got.
MS. WESTERVELT: I disagree.

[16] *Brown v. U.S., 356 U.S. 148 (1957) and Nutramax Labs v. Twin Labs, 32 F.Supp.2d 331 (D.Md. 1999)*(witness already made signed and self-serving statements relative to inquiry).

Because wrongfully withholding LVL X's chandelier, that it paid for, didn't work, Hackley caused LVL X's PGP construction permit to be cancelled by also wrongfully withholding the construction set of drawings, for which LVL X had also paid. Because that didn't work, Hackley next filed a false copyright application and this case. To mitigate the damages that Hackley was causing, at the suggestion of an individual in the permit office, LVL X hired defendant Way to review the PGP plans for permit purposes only. One reason that didn't work was because Hackley fraudulently did not disclose, and LVL X was not otherwise informed, that Hackley had withheld the construction set of drawings. LVL X hired a third architect, defendant John Trouton, to make a new set of drawings of the PGP store.

Hackley sold to LVL X the PGP drawings, or the irrevocable right to use them, and is continuously interfering with that right, to collect other money from LVL X it does not owe.

Not only did Hackley, as aforesaid, improperly invoke the Fifth Amendment, he also refused to testify on matters related to his claim for damages.[17] In their pleadings, plaintiffs alleged that the defendants jointly engaged in copyright infringement by stating that, for example, LVL X **and** CFG submitted and re-submitted a request for a permit using Hackley's drawings. *Amended Complaint, page 3, beginning on line 3.* Plaintiffs also alleged that LVL X, CFG, **and** Jeffrey Way, together, infringed on Hackley's copyright. *Id. at page 3, line 10.* Further, in paragraph 45, Hackley requested the court to order the "**defendants**" to pay $250,000 in damages for the **defendants'** infringement of plaintiffs' copyright. *Id. at page 13.*

---

[17] Hackley's deposition, page 253 (lines 14 through 22) and page 254 (lines 1 through 3):
Q: How much did you receive in settlements from Trouton and CFG?
MS. WESTERVELT: Objection.
MR. JOHNS: It's relevant to damages.
MS. WESTERVELT: I'm instructing you not to answer.
MR. JOHNS: Well, okay. Then don't bring any damage claims if you're not going to testify.

Clearly, plaintiffs knew the nature of their allegations on the date of Hackley's deposition. They also knew that they had settled with co-defendant CFG. Defendants were seeking to establish the amount that CFG paid to settle in that such amount would offset a damage award, if any, against themselves. *See, e.g., U.S. v. Bronston, 453 F.2d 555 (1971).* Because of Hackley's wrongful refusal to testify, defendants also seek sanctions, through Rule 16(f), that plaintiffs did not sustain any damages for the alleged violations in this case.

Under Section III(e) of the Scheduling Order, the court required the parties to meet with defendants by the discovery deadline, or 06-28-02, to conduct **"serious"** settlement negotiations. Plaintiffs' counsel agreed to have Hackley meet defendants at 10 N. Calvert St., Suite 141, Baltimore, Maryland, at 2:00 p.m. on 06-27-02, which is in the same building and on the same floor where plaintiffs counsel's office is located. On 06-26-02, plaintiffs in bad faith stated that they did not know what the word "here" meant. *Exhibit 12*. Plaintiffs were clearly not **"serious"** about the court ordered settlement conference as their remarks reveal that they believe that court ordered settlement conference is somewhat of a joke. Plaintiffs also did not provide any sufficient reason as to why they couldn't attend, or where else they had to be at 2:00 p.m., that was more important than complying with this court's order.

Under Rule 16(f), if a party fails to obey the scheduling order, then the court may make such orders with regard thereto that are just and any of the orders under in Rule 37(b)(2)(B), (C), or (D). Plaintiffs failed to seriously, in good faith, and/or without sufficient justification or excuse, cooperate with defendants to hold and/or to attend a settlement conference before the scheduling order's deadline date. The court possesses inherent power to impose sanctions for plaintiffs' misconduct. *Chambers v. NASCO, 501 U.S. 32, 43-44 (1991).* Defendants seek Rule 37(b)(2)(B) sanctions precluding plaintiffs' from opposing that LVL X paid plaintiffs for the PGP drawings; that plaintiffs' wrongfully withheld LVL X's chandelier;

and, that plaintiffs were not damaged by the violations that they allege in this case. These sanctions are clearly appropriate because Hackley refused to testify about these matters.

Respectfully submitted,

_____/s/_____
Christopher M. Johns, Esq.
P.O. Box 975, Laurel, MD 20707
Telephone: 301-674-6900
Facsimile: 301-540-5901
Bar No.: 15677

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 07-16-03, I caused a copy of the foregoing paper to be served to: Deborah Westervelt, 10 North Calvert Street, Suite 153, Baltimore, MD 21202 and Terrence McShane, 1211 Connecticut Avenue, N.W., Suite 425, Washington, D.C. 20036.

_____/s/_____
Christopher M. Johns