IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL HACKLEY, et al. | : | |
| Plaintiffs, | : | |
| vs. | : | JFM 02 CV 3363 |
| LVL X, INC., et al. | : | |
| Defendants. | : | |

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION

Defendants LVL X, Inc., John Lee, and Jeffrey Way respectfully submit this memorandum of points and authorities in support of their motion for summary judgment and also in support of their opposition to plaintiffs' motion for summary judgment, stating that:

The agreement[1] between Hackley and LVL X does not contain any American Institute of Architecture ("AIA"), or other, language that specifies ownership, nor that in any way restricts the use, of any drawings. *Exhibit 1.* To the contrary, their agreement simply provides for termination upon ten (10) days written notice with no reservations, or restrictions, whatsoever on the use of drawings.[2] The scope of the contract was for Hackley to make

---

[1] *Exhibit 1* and Hackley's deposition, page 303 (lines 5-7), page 129 (lines 1-4) and page 130 (18-20):
Q: You wrote the … contract proposals, [Deposition] Exhibit Number 30; isn't that right? A: Yes.
Q: … These proposals represent an understanding between … you and Level X? A: Yes.
[2] Hackley's Depositions, p. 402, lines 9-16, p. 403, lines 5-8), p. 404 (line 2-13): Hackley's attorney:
Q: Mr. Hackley, you've been handed what's been labeled **Exhibit 30B** which you were asked about yesterday.
A: Yes.
Q: Could you state quickly what this is?
A: It's dated 18th of May 2000. This is one of the standard contracts that I used with John Lee and Level 10 over the course of the years that I did business with them.
Q: You testified earlier when Mr. Johns asked you about that, this was a course of conduct?
A: Yes. By the way, this was signed by John Lee. At least this scribble looks like his signature.
Q: You testified yesterday that I believe Mr. Johns showed four contracts for stores that you did for Level 10?
A: Yes, Exhibit 30B.
Q: I believe you testified yesterday that you did not have written contracts for the more recent stores? A: Yes.
Q: Mr. Johns asked you a number of questions about these agreements that were in writing and I'm asking you another question which is regarding the termination clause.
A: Okay.
Q: You just read the termination clause.
A: Should I reread it?
Q: No. Did Mr. Johns yesterday ask you if you had a course of conduct with Level 10 regarding these agreements, and I'm asking that same question for the termination clause?
A: Yes, I did.
Q: And John Lee signed this agreement?
A: Yes, John Lee signed this agreement with the termination clause and the construction cost clause in the agreement.

"construction documents", like the PGP drawings, for LVL X to use to construct a store, like LVL X's PGP store. *Exhibit 1.* Beyond that, Hackley's role was expressly stated in the contract to be solely at LVL X's, not Hackley's, "option". *Id. at page 2.* Nor did Hackley use a copyright notice "©" on any of the drawings that he worked on for LVL X. *Exhibit 2, para. 1.* Hackley even obtained a building permit[3] specifically for LVL X to use the drawings at PGP even before LVL X paid him for the drawings.[4] In the copyright application, Hackley titled the work "LVL X", defendant's corporate and trade name. *Exhibit 5.* And, Hackley used the PGP address where Hackley and LVL X intended the PGP drawings to be used. *Id.*

Hackley says that there was misunderstanding on whether LVL X owned and/or could use the PGP drawings.[5] *Exhibit 6.* LVL X contends there was no misunderstanding, as it clearly had a right to use them. If there was a misunderstanding, it was caused by the contract, which Hackley, as a professional architect and expert, drafted, and/or by his conduct. In all fairness and equity, Hackley should not be entitled to benefit by being awarded damages or relief arising out of a misunderstanding or dispute that Hackley, himself created and caused.

Seeking summary judgment *(S.J. Memo, pages 9 and 10)*, plaintiffs rely on *Johnson v. Jones, 149 F.3d 494 (1998 7th Circuit).* Their reliance however is clearly misplaced. In

---

[3] Hackley's deposition, page 173 (lines 16-22):
Q: All right. And specific to this case, what happened in this case? So assuming that's all done --
A: We obtained a permit.
Q: When you say "we," do you mean Matt?
A: My company obtained a permit for Prince George's Plaza.
[4] Hackley obtained the permit on 05-16-2002. *Exhibit 3.* LVL paid Hackley the remaining $7,500 balance for the PGP drawings on 05-28-2002. *Exhibit 4.*

[5] *Exhibit 6, paragraph 3:* "Be advised that there may be a misunderstanding here. We never 'sell' drawings to clients. My clients do not own our drawings. Our clients pay for our professional service, not drawings …"
Hackley's deposition, page 302 (lines 4-7):
Q: Now Mr. Hackley, so there could have been a misunderstanding about ownership of drawings … ?
A: I guess there could be a misunderstanding.
Q: You've never heard the AIA … want architects … to put in their contracts …who owns the drawings?
A: Of course I've heard of that, but it's not necessary … I own the drawings whether I make that statement or not.
Q: Well, there could be a misunderstanding on that, right, as you state in this letter?
A: Could be a misunderstanding but that doesn't mean I don't own the drawings.

*Johnson*, the court primarily focused on how insistent the architect was in setting forth contract proposals that included AIA provisions essentially expressing ownership of the drawings in the architect <u>and</u> restricting the use of them. *Id. at 497-98.* These provisions were in each proposal that Johnson presented to Jones. Hackley never presented, signed, nor had any paper like that with LVL X. The court also found it material that Johnson, unlike Hackley in this case, had used a copyright notice "©"on his drawings. *Id. at 499.* In none of the 13, or so, drawings that Hackley worked on for LVL X did he use a copyright symbol. *Exhibit. 2, para. 1.* Unlike this case, Jones did not pay Johnson. LVL X did pay Hackley. *Id. at para. 2.*

Defendants respectfully submit that this Court should instead look to the facts and analysis in *I.A.E, Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996).* Like *Shaver*, but unlike *Johnson,* Hackley also used a proposal letter for a contract. Hackley did not use AIA, or other, contract provisions expressing ownership, nor restricting the use of the drawings. Hackley's role or  scope of work as expressed in the contract ended with the completion of the drawings. The consideration of $10,000 (coincidently the same consideration as in *Shaver*) stated in Hackley's contract was for the completion of the drawings. Hackley named or titled the work in the copyright application in LVL X's corporate and trade name and used the address where Hackley intended the drawings to be used. And, like *Shaver,* there also was no condition precedent in Hackley's contract saying that the plans had to be paid for before being used.

However, the facts in this case (discussed further below) are much more severe than in *Shaver.* Hackley did not use a copyright symbol on the PGP drawings. Hackley obtained a building permit for LVL X to specifically use the PGP drawings at PGP before being paid for them. The PGP drawings <u>were</u> <u>not</u> accepted by the permits office. The PGP drawings <u>were</u> <u>not</u> ultimately used. LVL X paid Hackley for the drawings.  Hackley mailed to LVL X a fraudulent rendering bill and refused to provide LVL X with a break down of that and other

3

bills. Hackley then improperly withheld LVL X's chandelier in an attempt to collect his fraudulent rendering bill. Because that didn't work, Hackley then shut LVL X down at PGP by voiding its permit.[6] And, because that also still did not work, Hackley then filed this lawsuit using a false copyright application. By Hackley engaging in the aforesaid malicious misconduct, plaintiffs, not LVL X, defaulted on their professional relationship with LVL X. Hackley also seriously and maliciously interfered with the very right, that he sold to LVL X.

On 05-28-02, LVL X paid Hackley the remaining $7,500 balance for the PGP drawings with its $10,000 check. *Exhibits 2 (para. 2) and 4.* Hackley contends that $8,000 of said payment was instead for the "electronic drawing" or rendering invoice. However, on 05-08-02, before LVL X paid Hackley the $10,000, LVL X asked Hackley for a breakdown of the $8,000 (64 hours at $125 per hour) rendering invoice[7] and other invoices *(Exhibit 7).* *Exhibit 2, para. 3.* It is clearly a fraudulent bill because Hackley billed LVL X for the draftsman at the $125 per hour principal architect rate used for Hackley. *Exhibit 1, page 2.*

Hackley testified that he had no records of any kind to support his rendering invoice.[8] The draftsmen, John Chalk, testified that Hackley never even asked him (Chalk) for the

---

[6] Malinda Steward's deposition, page 80 (18 through 22), page 81 (lines 1 through 6):
Q: … the permit that was cancelled by Mr. Hackley per his June 21 letter -- *(Exhibits 3 and 17).*
A: Yes.
Q: -- it was still necessary to cancel out 00; is that correct?
A: We could respond to Mr. Hackley's request since he made the original application, and that's what we did.
Q: Okay. But 00 was still in play until receiving Mr. Hackley's letter? A: Yes.
Q: And was still a viable permit until the cancellation pursuant to Mr. Hackley's letter? A: Yes.

[7] Hackley deposition, page 218 (lines 6 through 10) and page 82 (lines 4 through 11):
Q: You're saying Mr. Chalk is a draftsman on the rendering as well?
A: Yes … I personally do not use an Auto CADD program.
Q: Or any other computer-related design program?
A: Correct.

[8] Hackley's deposition, page 228 (lines 1 through 22) and page 229 (lines 1 through 19):
Q: Did you destroy the time records you said you have? A: I've never destroyed any time records.
Q: Where are they?
A: **I have no time records.** The invoice is my record of time. **(continued on to next page)**

4

number of hours that he had spent working on the rendering. *Exhibit 9, paragraph 13.* Hackley admitted at his deposition that he did not even ask Chalk for his time. And, Hackley could not even testify to how much time he, himself, had allegedly spent on the rendering. Hackley just came up with the flat rate price he wanted, $8,000, and assigned 64 hours at $125 per hour, to it. Hackley fraudulently came up with this flat rate even though, as he told his draftsman, he never gave LVL X a price for the rendering. *Exhibit 9, para. 13.* LVL X was induced to pay plaintiffs $10,000, because plaintiffs agreed that said $7,500 of it would pay the remaining balance for the PGP drawings. *Exhibit 10 & 2 (para. 4).* While seeking equity, plaintiffs are essentially asking this Court to recognize their fraudulent rendering bill to find that LVL X paid for the rendering and not the drawings, in an attempt to negate LVL X's right to use the drawings. Plaintiffs claims are grounded in their own fraudulent rendering bill.

The fact that LVL X paid for the right to use the PGP drawings is further amplified by the fact that Hackley acknowledged it. He told his own draftsman, Chalk, that LVL X had paid him for the PGP drawings. *Exhibit 9, para. 13.* And, in accordance with their course of dealing, Hackley paid Chalk for his work on the PGP drawings.[9] Hackley refused to produce

---

Q: That's the only record of your time – A: Yes.
Q: That's the only record of your time that you ever made for this job is that invoice saying 64 hours?
A: Yes, sir. He got a very good product and got it for a good price.
Q: You never asked John Chalk, as he states in his Affidavit, for his time; isn't that correct?
A: John didn't give me his exact hours. I think he just gave me the price he wanted, how much he wanted for his time, so I assume he did his own number of hours. I just estimated that for the amount of money that he wanted and I put my hours into it, and that's the price I came up with.
Q: What part of the 64 hours are you claiming are his hours and your hours?
A: I don't remember exactly. This has been a year.
Q: But some of them are his hours and some of them are your hours?
A: Some of them are his hours and some are my hours.
Q: And you don't know?
A: At this moment I don't know. This has been a year ago and your client has cheated me out of this for a whole year. I haven't gotten paid for this.
Q: So you expect my client to pay for something that you don't even have any records for as to time, dates, anything; isn't that correct? A: My record is my invoice, and I've been asked and I've answered that.
[9]Chalk's deposition, page 59, line 10:
 "The deal I had with Michael was when he got paid, I got paid."
Q: … [H]ave you paid John Chalk for the rendering? A: No. (Hackley's deposition, page 136, lines 6-8).

the check that he used to pay Chalk for the PGP drawings, but then capitulated. *Exhibit 11*. Hackley also told Chalk that LVL X had not paid him for the rendering. *Exhibit 9, para. 13*. And because of this, he was going to pull LVL X's PGP permit and thereby shut LVL X down. *Id.* In a prior attempt to collect on the rendering invoice from LVL X, Hackley admittedly withheld LVL X's Tyson's Corner chandelier for which he admits LVL X had also paid. *Exhibits 12, 13*. Hackley now adds this case to the list of his unlawful attempts to collect his fraudulent rendering invoice. Hackley doesn't deny that he currently has another attorney to collect on the rendering[10] in that he knows LVL X paid him for the PGP drawings, and not for the rendering. However, Hackley has not filed a state district court case for the rendering. Although the above evidence is enough, Hackley's 06-07-02 letter reflects his agreement to apply $7,500 of LVL X's $10,000 check to the PGP drawings. Therein, Hackley lists the rendering invoice, and not the PGP drawings invoice, as an "outstanding" invoice.[11]

The Fourth Circuit recognizes one's irrevocable nonexclusive right to use drawings for its intended purpose. *I.A.E., Inc. v. Shaver, 74 F.3d 768, 777-8 (7th Circuit 1996)* citing *Avtec Sys., v. Peiffer, 21 F.3d 568, 574 n.12,* the Court's recognition of this theory and *3 Nimmer Sec. 10.02[B][5]*. Like the court in *Shaver*, this Court should also grant defendants' motion for summary judgment. Hackley has not raised any genuine issue of material fact against a

---

[10] Hackley's deposition, page 300 (lines 17 through 22) and page 301 (lines 1 through 5):
Q: You still have an attorney-client relationship with Mr. Dore; is that correct? A: Correct.
Q: He's retained to collect money for the rendering, correct?
A: I have an attorney-client relationship with him.
Q: For that purpose? A: Maybe for that purpose and other purposes.

[11] *Exhibit 14* and Hackley's deposition, page 383 (lines 18 through 22) and page 384 (lines 1 thru 11):
Q: Mr. Hackley, you've been handed … a letter dated June 7th. We talked about it earlier. A: Yes.
Q: Just to recap for the time line that we're trying to create, just in two sentences what is this?
A: This is a letter directed to John Lee at Level 10 about his … outstanding invoices … it says: Just so there's no misunderstanding, be advised that we do require payment in full for all of our outstanding invoices ...

finding that Hackley created a nonexclusive license to use the drawings to construct a LVL X store at PGP. Because of this, none of the defendants infringed on the plaintiffs' rights.

For the plaintiffs to ask this court to find that LVL X did not pay for the PGP drawings, plaintiffs would essentially be asking this court to exert its powers on plaintiffs' behalf to recognize their fraudulent rendering bill and thereby aid, abet and further plaintiffs' continuous and costly attempts to collect said bill and to interfere with LVL X's right to use the PGP drawings, and with other rights. *Keystone v. Excavator, 290 U.S. 240, 245 (1933).*

However, if the court should find that LVL X did not pay for the PGP drawings, defendants are still nevertheless entitled to summary judgment in that Hackley defrauded LVL X into paying him for the rendering instead of the drawings, and LVL X is entitled to a judgment under its unclean hands and/or fraud defenses. Hackley failed to disclose that a draftsman worked on the rendering and was billed at the principal architect's rate. Hackley failed to disclose that he never asked for the draftsman's hours. Hackley failed to disclose that he, himself, didn't know his own alleged hours. He failed to disclose that he had no records of any kind from which he created the rendering invoice. He failed to disclose to LVL X that the rendering bill was not really calculated on hours, but was just a flat rate bill for $8,000.[12]

Defendants further respectfully submit that they are entitled to summary judgment even if one were to assume that LVL X did not pay plaintiffs for the drawings also because there is no condition precedent expressed in the contract Hackley drafted, conditioning the use of the drawings on full payment for the drawings. Defendants' position on this point is fully

---

[12] *Exhibit 2, para. 5.* Hackley disguised the rendering invoice as an hourly invoice because he never gave LVL X a flat rate price to make a better sketch of how the store would look before constructing it. *Exhibit 9, para. 13.*

supported by Hackley obtaining a building permit specifically for LVL X to use the drawings at PGP before LVL X paid him for the drawings. *I.A.E, Inc. v. Shaver, 74 F.3d at 778.*

For the record, Hackley delivered the rendering late, after LVL X had already constructed two of its stores with the alleged new image. LVL X therefore no longer needed a more detailed "sketch", than Hackley provided (*Exhibit 8*), to see how the new image would look.[13] Also, once a store is built, a picture of it suffices better and cheaper than a rendering.

LVL X rightfully no longer trusted Hackley, nor his invoices, as his billings and behavior became increasing more erratic and unstable. Hackley's invoice summary should be reduced not only for Hackley's fraudulent rendering invoice, but also for the $2,500 Paramus Park retainer. *Exh. 10 and 15.* LVL X certainly did not want to retain him for Paramus Park especially after he mailed to LVL X a fraudulent $8,000 rendering invoice, he refused to give LVL X a breakdown of this and other invoices, Hackley wrongfully withheld its chandelier,[14] and then further tried to extort LVL X by pulling its PGP permit and shutting it down.

---

**13** Hackley's deposition, page 233 (lines 12 through 22) page 234 (lines 1 through 18):
Q: The storefronts of the trio, talking about Annapolis, Tysons and PGP, are those adequate for prospective landlords to view on the Internet or otherwise? A: How would they view them on the Internet?
Q: Well, I'm just asking you a question. If they could, are they adequate?
A: I would suppose if there were pictures of them, maybe. At that time that we did this, we didn't have these built I don't think.
Q: So none of the trios were built at the time; is that right?
A: I don't think so. I think that's probably the reason he asked me for these. I didn't ask John Lee if he wanted me to do these. John Lee asked me to do this for him.
Q: So now the story is this was ordered prior to the trio stores being built?
A: I don't remember the exact time frame and I've testified to that.
Q: And you -- so you delivered this after two of the stores were built; isn't that correct?
A: I delivered it probably shortly before the date of the invoice, as I've testified already.
Q: So wouldn't a better price for Mr. Lee have been just to take a picture of a storefront and put that on the Internet? Isn't that cheaper than $8,000?
A: John Lee asked me to do this for him. I didn't request what he wanted.
**14** Hackley's deposition: page 162 (lines 6 through 12):
Q: If an architect withholds or steals a client's chandelier, do you think a client should trust that architect?
A: I'm not going to answer any questions about the chandelier.
Q: Based on what?
A: Fifth Amendment.

In his "Supplemental Response to Interrogatory Number 10" *(Exhibit 10),* Hackley admits that LVL X paid him for the chandelier and that he withheld it to attempt to coerce money from LVL X. Hackley knew that LVL X urgently needed its chandelier.[15] The day after Hackley withheld it, because of time constraints, LVL X had no choice but to buy another one and it thereafter no longer needed the chandelier that Hackley stole.[16] Hackley left out of his alleged "complete"[17] statement that he refused to give the chandelier to LVL X when Reece went to pick it up. See, and compare: Hackley *Exhibit 12* with Reece *Exhibit 13.*

Hackley also left out of *Exhibit 12* which invoice he was trying to collect by withholding LVL X's chandelier (the rendering or the PGP drawings invoice). *Exhibit 12.* And, each time defense counsel lead Hackley into this area of inquiry, Hackley flatly refused to answer by improperly invoking the Fifth. Counsel sought an admission that Hackley withheld the chandelier to get LVL X to pay him for the rendering, *a fortiori,* LVL X had paid him for the PGP drawings.[18] By improperly invoking the Fifth, Hackley unfairly prejudiced defendants' attempt to further show that LVL X had paid Hackley for the PGP drawings.[19]

---

[15] Hackley's deposition: page 161 (lines 3 through 9):
Q: So your testimony is that you do recall that it was a very tight time schedule to get the store open; is that correct? A: All the stores had a tight time schedule. Q: I'm talking about for Tyson's Corner. A: Well, yes.
[16] Hackley's 05-20-02 billing summary should also be reduced for $1,928.96 chandelier that Hackley improperly withheld or stole from LVL X. *Exhibit 16.* Because LVL X had to replace it and because there are no more plans to use a chandelier. The chandelier has no value to LVL X. *Exhibit 2, para. 6.*
[17] Hackley's 06-16-2003 deposition, page 9 (lines 11 through 22), page 10, page 11 (1 through 8):
Q: Do you solemnly declare and affirm under the penalties of perjury and upon personal knowledge that supplementary response to interrogatory no. 10 is true, correct, and complete?
A: To the best of my knowledge.
[18] Hackley's deposition, page 163 (lines 1 thru 4) and page 197 (lines 3 thru 9):
Q: By withholding LVL X's chandelier under a tight time schedule to open, you were trying to cause them to pay money that they didn't think they owed you; isn't that correct?
A: I'm not going to answer any questions [a]bout the chandelier.
Q: And … withholding their chandelier, it didn't cause them to pay you money that they didn't think they owed you; isn't that right? A: I'm not going to answer any questions about the chandelier.
Q: Based on what? A: Fifth Amendment.
Q: Well, you withheld their chandelier to try to get them to pay you money; isn't that correct?
A: I'm not answering any questions about the chandelier. Q: Based on what? **A: The Fifth Amendment.**

Hackley clearly waived his Fifth Amendment privilege on matters relative to Hackley withholding LVL X's chandelier to coerce LVL X into paying him money. Hackley had already submitted a supplemental interrogatory answer number 10 on this and related matters. *Exhibit 12.* He had also already answered deposition questions about his supplementary answer to interrogatory 10.[20] He also repeatedly declared that he never stole the chandelier.[21] Saying that Hackley did not waive his Fifth Amendment rights is clearly without any factual[22] or legal[23] basis. Defendants further respectfully submit that they are entitled to summary judgment as it is also an established fact pursuant to defendants' Rule 16(f) motion for sanctions that LVL X had paid plaintiffs for the right to use the PGP drawings for the intended purpose of constructing its LVL X store at the Prince George's Plaza mall ("PGP").

---

[19] Hackley told Chalk he was going to shut LVL X down by pulling its PGP permit because it didn't pay him for the rendering *(Exhibit 9, para. 13)* in that withholding LVL X's chandelier didn't work.

[20] See, footnotes 17 and 18.

[21] Hackley's deposition, page 264 (lines 8-13); and page 281 (lines 16-20):
Q: And they were afraid you were going to try to extort them like you stole their chandelier …
A: I never stole anything and I never extorted anything.
Q: What you call fraudulent was mitigation of damage by the defendants because you stole his chandelier, and you were going to go after the permit next, and that's what you did.
A: Absolutely untrue, false.

[22] Hackley's deposition, page 156 (lines 6 through 22) and page 157 (lines 1 through 8):
Q: You already have answered questions about the chandelier, and you have to answer any questions that I ask.
A: I refuse to answer any questions about the chandelier.
Q: On what grounds are you basing your refusal? A: **Fifth Amendment**.
Q: No, you already waived it. You've already answered questions about it.
A: **I refuse to answer any more questions.**
MR. JOHNS: … He's waived any Fifth Amendment privilege he's got. MS. WESTERVELT:  I disagree.

[23] *Brown v. U.S., 356 U.S. 148 (1957) and Nutramax Labs v. Twin Labs, 32 F.Supp.2d 331 (D.Md. 1999)*(witness already made signed and self-serving statements relative to inquiry).

Hackley voided LVL X's permit in a further attempt to collect money, not for public safety reasons. First, because mailing LVL X a fraudulent bill and steeling its chandelier did not work, Hackley told Chalk that he was going to pull LVL X's PGP permit to collect on the rendering invoice. *Exhibit 9, paragraph 13*. Not only does Hackley not deny saying this, he testified that he <u>could</u> <u>have</u> said this to Chalk.[24] Second, the permit that Hackley first caused to be voided was the one <u>he</u> obtained for the PGP drawings (16554-2002-00). *Exhibits 3 and 17*. Third, Hackley was not aware that LVL X obtained any other permit until 07-01-02, after he had already sent his first letter. Compare, *Exhibits 17 with 18*. And Fourth, Hackley told the PG's permit supervisor, Ms. Hall, that he was voiding LVL X's PGP permit over money.[25]

Still not able to collect on his fraudulent bill, plaintiffs bring this case grounded on a false copyright application. First, Hackley characterizes the nature of the work as being "architectural" works. *Exhibit 5*. "Architectural works" are defined as "the design of **a building** as embodied in any tangible medium of expression (emphasis added)" 17 U.S.C.A. Sec. 101. The "accused drawings" in this case are not drawings of a building. After an exhaustive analysis of the law, the court in *Yankee Candle*, for example, stated that it had "difficulty concluding that constructing an empty room in a large shopping mall into a … shop … transforms that room into a 'building' within the meaning of the Copyright Act …" *Yankee Candle Co. v. New England Candle Co., 14 F.Supp.2d 154 (D.Mass. 1998).* Hackley's

---

[24] Hackley's deposition, page 133 (lines 5 through 15):
Q: And Mr. Chalk … testified, not only that you acknowledged to him that LVLX had paid you for the PGP plans, but that you were going to pull … the permit … because they had not paid you for the rendering. …
A: I don't remember having any conversation with Chalk about withdrawing the permit.
Q: So it could have happened; isn't that right? A: **Could have**, but I don't remember it.

[25] Suzanne Hall's deposition, page 13 (lines 14 through 17) and page 14 (line 1):
A: The only thing I knew was that he wanted it cancelled. Q: Was it over money? A: As far as I knew, that's what it was. Q: And how did you know that? Through your conversations with Hackley? A: Just through a conversation. But I mean I don't know … who owed who money.

false characterization has substantial ramifications. For example, such a characterization would make the Architectural Works Copyright Protection Act applicable to the *technical* drawings at issue in this case. *Id.* Hackley, himself, characterizes the drawings as technical drawings in his contract. *Exhibit 1, page 1, Phase 2 Construction Documents, number 1.*

Second, Hackley's copyright application is false because Hackley failed to disclose that elements in the PGP drawings were derived from other works. *Exhibit 5.* Hackley is suing for an alleged infringement of the cash wrap table. However, four of the major elements of "his" cash wrap design are identical to Hackley's "Le Corbusier" conference room table. The four copied design elements are the legs, the posts, table top and the combination of these elements in relation to each other. *Compare*, *Exhibits 19A and 19B with Exhibit 20.* Exhibits 19A and 19B are an isolated view of these elements that appear in the PGP drawings. Exhibit 20 is a picture of the "Le Corbusier" table with a technical drawing of the "Le Corbusier" table. While in Hackley's office, Hackley told Lee that he was going to design LVL X's cash wrap table using the design of his "Le Corbusier" conference room table. *Exhibit 2, para. 7.*

Third, Hackley also failed to disclose that he derived the store front TV towers, for which he is also suing, from CFG's employee, Ron Reece. On 06-29-2001 Hackley sent a memo to CFG asking CFG to: "[p]lease forward specific TV display details used in Atlanta to me and Jeff Harris at Dolphin Mall for his approval of this issue. Construct these the same as in the Atlanta Store." *Exhibit 21.* Ron Reece made an affidavit on this matter in which he states that he was the creator of the TV towers design for all of the LVL X stores. *Exhibit 22.*

Defendants respectfully submit that they are entitled to summary judgment for any combination of these three substantial defects in Hackley's copyright application. The copyright application is for "architectural works", while the drawings that plaintiffs are suing for are not. They are technical drawings. There is no copyright application for the drawings at

issue in this case. Plaintiffs are suing for the cash wrap design which clearly came from "Le Corbusier". Plaintiffs are suing for the store front TV towers which clearly came from CFG. Defendants respectfully request summary judgment because there is no copyright application to support the type of drawings at issue in this case and/or the copyright application is false.

In their motion for summary judgment, plaintiffs characterize this as a straight forward case, but yet did not include copyright infringement in their motion. *S.J. Memo, page 1.* Defendants respectfully submit that although, as shown above, defendants are entitled to summary judgment, plaintiff did not engage in straight forward conduct relative to this case. Also, as aforesaid, defendants dispute the claim that the drawings are "architectural works". Regarding the procedural history of this case, defendants would like the record to again reflect that they consented to plaintiffs' motion to dismiss only because plaintiffs consented to the defendants fully preserving their right to bring any and all claims they have against plaintiffs in state court. Defendants have always contended that this case belongs there instead of here.

Defendants dispute that plaintiffs designed the drawings at issue in this case. *S.J. Memo, page 3.* For example, as shown above, plaintiffs' copied the "Le Corbusier" table and Ron Reece's TV towers as these were derivative works over which Hackley is suing defendants. Further, Lee did not say in the pages cited that Hackley did the design work. *Id. at "B".* Lee also did not say on the pages cited by plaintiffs that he terminated Hackley. *Id. at "C".* It was impossible to terminate Hackley from the PGP contract because he had already completed phase 2 of the contract. The remaining part of the contract is optional. *Exhibit 1.* Further, under the contract, written notice is required to terminate either party. *Exhibit 1.*

Defense counsel offered to copy Hackley's deposition exhibits for plaintiffs' counsel. Thereafter, plaintiffs' counsel, however, stormed out of the deposition without making copies of documents that she was to make on the copy machine where the depositions were held, and

to this day, defense counsel has neither requested nor received those documents. While she was on her way out, it was left that each side would hire a copy service to make copies. This is similar to what occurred earlier. On the initial production of documents, defense counsel suggested that it would be less expensive to produce our own copies of many of the documents. Plaintiffs' counsel snidely rejected this offer. Defense counsel offered this in a very polite manner in an effort to save all parties money on expenses. Defense counsel did not offer or agree to copy the permit office exhibits nor could he, as plaintiffs' counsel alleges, in that most of the exhibits are drawings. Plaintiffs' counsel has not once contacted defense counsel to make arrangements for a copy service to make copies, but she is clearly free to do so. Defense counsel thought that maybe plaintiffs' counsel had not purchased various depositions and was not interested in the exhibits in that they have already been produced.

Lee disputes that he, personally, had a business relationship with Hackley, nor does Lee say that in the document that plaintiffs' cite. *S.J. Memo, page 4 "D"*. Lee disputes plaintiffs' assertion that the terms of the parties relationship was based solely on conduct.[26] *Id.*

---

[26] Hackley's Depositions, page 402, lines 9-16, page 403, lines 5-8), page 404 (line 2-13):
Questions by Hackley's own attorney:
Q: Mr. Hackley, you've been handed what's been labeled Exhibit 30B which you were asked about yesterday.
A: Yes.
Q: Could you state quickly what this is?
A: It's dated 18th of May 2000. This is one of the standard contracts that I used with John Lee and Level 10 over the course of the years that I did business with them.
Q: You testified earlier when Mr. Johns asked you about that, this was a course of conduct?
A: Yes. By the way, this was signed by John Lee. At least this scribble looks like his signature.
Q: You testified yesterday that I believe Mr. Johns showed four contracts for stores that you did for Level 10?
A: Yes, Exhibit 30B.
Q: I believe you testified yesterday that you did not have written contracts for the more recent stores? A: Yes.
Q: Mr. Johns asked you a number of questions about these agreements that were in writing and I'm asking you another question which is regarding the termination clause.
A: Okay. Q: You just read the termination clause. A: Should I reread it?
Q: No. Did Mr. Johns yesterday ask you if you had a course of conduct with Level 10 regarding these agreements, and I'm asking that same question for the termination clause?
A: Yes, I did.
Q: And John Lee signed this agreement?
A: Yes, John Lee signed this agreement with the termination clause and the construction cost clause in the agreement.

Hackley makes it clear that deposition Exhibit 30B *(Exhibit 1)* clearly controlled the "course of dealing" or the terms of the parties' understanding. Hackley's deposition testimony was in response to questions put to him by his own attorney and further amplifies facts in defendants' favor. First, because Hackley wrote the contract and it should be construed against plaintiffs. Second, Hackley understood the provisions in it. Third, the agreement does not specify that Hackley owns the drawings. Fourth, Hackley does not restrict the use of the drawings, nor reserve any rights whatsoever. Fifth, there is no condition precedent requiring payment to use the drawings. And sixth, Hackley understood that he mailed to LVL X a fraudulent rendering bill in that he understood, among other things, that he over charged LVL X by billing LVL X for the draftsman's hours, that he did not know, at the principal architect's $125 per hour rate.

On the bottom of page 4 of their memorandum, plaintiffs aptly point out that Hackley submitted the drawings to obtain a building permit. This further supports defendants' position that LVL X had a right to use them for the intended purpose, to construct a store at PGP. And, still further, on the top of page 5, plaintiffs point out the strong fact that the permit was issued.

Defendant Jeffrey Way's conduct was within the scope of LVL X's license to use the PGP drawings to construct LVL X's PGP store and only became necessary because Hackley seriously and substantially interfered with that right. The scope of Hackley's contract included permit services or the "permit review process". *Exhibit 1, page 1, Phase 2, number 1, line 3.* Defendant Way reviewed the PGP drawings, and then signed and sealed the drawings for permit purposes only,[27] *(S.J. Memo, page 5)* not to claim ownership of the drawings, but to

---

[27] Jeffrey Way's deposition, page 9, lines 18-22; page 10, lines 1-22; page 11, lines 1-15.
Q: Do you recall the first time you had any communication with Mr. Lee?
A: Yes.  I received a call from him.
Q: And do you have an idea of what time frame that might have been?
A: Only to say during the Summer of 2002, possibly July, somewhere in there.
Q: Okay. That's fine. And what was the, can you -- what was discussed in that first phone call?

comply with Maryland Code which required him to do exactly what he did:  *"[b]efore a licensed architect ... submits to a public authority any final drawing ... required for the issuance of a building permit, the licensed architect who prepared* **or approved** *of the document* **shall** *sign, seal, and date the document (***emphasis added***).*  *Md. Bus. Occ. & Prof. Section 3-501* and *State Board v. Clark, 114 Md.App. 247, 260-261, 689 A.2d 1247 (1997).* As the record that plaintiffs present shows, after Way did so, Way gave the plans to CFG.[28] CFG is an independent contractor. Unbeknownst to LVL X, Lee and Way, CFG put lines through Hackley's name, but in doing so, it <u>did</u> <u>not</u> redact Hackley's name, as it was still very much visible to anyone at the permit office. Nothing in the record indicates that defendants

---

A: He informed me that -- actually, I'd like to mention that his call was a follow-up call to a prior call. I was contacted by the mall management at Prince George's Plaza, and the mall management informed me that they had a tenant who was a current tenant who was going to be relocating to another space in that mall, and that this tenant, whom I later found out to be John Lee, **needed some assistance in permit services**, and then he said, Mr. Lee, the mall management said Mr. Lee will be contacting you. And then I got a call from Mr. Lee.
Q: So the mall management person told you that John Lee would be calling you, and then John Lee called you. And could you explain what occurred in that first contact?
A: Mr. Lee informed me, as best as I can recall -- Q: Sure. A: -- that he had some plans, that he was endeavoring to get a building permit from Prince George's County, DER, I guess, which stands for Department of Environment or Resources, or something like that. They informed him that he needed to have his plans reviewed and sealed by an architect, and that's what he informed me of, that's what he requested of me, and that's what he asked if I had the capability of doing. I said possibly, I guess we can see what you have. And that was the nature of our first conversation.

[28] Jeffrey Way's deposition, page 18, lines 13-22; page 19, lines 1-22.
Q: And what did you do after you were given the plans?
A: I took the plans, **I reviewed them**, and after I was completed with the review, after I determined in my opinion that the plans, you know, conformed to the building codes and there were adequate means of egress -- I mean, in a retail space it's very, it's very straightforward, basically you have a box, you have an entrance doorway, and you have a couple of emergency egress or secondary doorways to get out of the place, you have to have exit signs there or emergency battery pack lights, just enough to make sure that if there's a power failure the patrons or employees can see their way to the exit, and there's usually a bathroom or something. That was typical for this store. **It was a very straightforward, just a big box store, as many retails stores are now**, and they're just basically pretty much dressed out with racks of merchandise, and that's the case with this store, it was pretty much a box. **So I was able to determine in my opinion that the plans seemed to be in conformity with what I, you know, know code requirements to be. At that point I signed and sealed the plans, but I put a superscription or subscription, I either wrote it above or beneath my seal on the plan, it said for permit review only or for permit purposes only, something like that, and I affixed my signature, my initial signature thereto.**
Q: And then who did you return the drawings to? I do recall meeting with -- I'm sorry. The record, I'm sure, will reflect whatever his name was, but the general contractor.
Q: Could it have been Ron Reese?
A: That sounds familiar, and I gave the plans back to him.

LVL X, Lee, nor Way, put lines through, nor redacted his name from the PGP drawings. CFG settled with Hackley. Even Jeffrey Way, an architect, even noted how Hackley failed to adequately expresses his alleged ownership of or restrictions on the PGP plans. The other defendants, other than Way, are not professional or experts, who certainly can be mislead much more easily than an experience architect such as Way. [29] The permit office rejected the drawings Way approved and no permit was issued. *Amended Complaint, page 3, line 13.*

---

[29] Jeffrey Way's deposition, p. 21, 6-22; p. 22, 1-17; p. 26, 10-18; p. 28, 17-22; p. 29; 30; 31, 1-12.

Q: Okay. When John Lee asked you to provide this service, did he tell you that Level X owned the drawings?
A: That was my understanding, yes.
Q: And was it your understanding because of something that Mr. Lee said or someone else from Level X said?
A: Well, when I looked at the drawings they seemed to exhibit, in my opinion, you know, ownership. I did not see anywhere in the plans when I was reviewing them, I didn't see anything that expressed that the plans were not owned by the national brand… And I presumed, based on, you know, their bringing the plans to me and that Level X was very large in terms of, you know, its typeface or the lettering on the cover page, and it seemed to me that they were their plans. I mean, I didn't question that they were not their plans.
Q: Mr. Way, what, if any, copyright markings that one would typically see did you see on the plans?
A: I don't recall seeing any particular or explicit, you know, references of copyright. You mean the tie-back to the previous plan preparer?
Q: Well, like a "C" or anything like that. Do you recall? You don't seeing that, do you?
A: No, I do not.
Q: Sure. Then one other question as a follow-up to Mr. John's question about the copyright notice. Do you put the copyright notice on the plans that you create yourself?
A: Yes, I do. It depends on the nature of it. For example, if I'm doing it -- if someone has hired me to do a design for a house or something and it's particularly unique or there are some -- there's something unconventional there that's, you know, is somewhat of an invention, then, you know, I would probably invoke an express copyright on there. If the plans were prepared for an entity that I was serving, even though I'm a registered architect or even just as a plan preparer, if it served a larger entity, then they would probably have me put a copyright that references, you know, the entity, for examp le, if I was doing something for a corporation, a restaurant, or something like that.
Q: Okay. In your number of years as an architect, I imagine you've had plenty of occasions to view other architects' work; is that correct?
A: I would say a pretty good number of architects' work. I pay more attention to my own.
Q: I'm sure you do. And in reviewing other architects' works, do you always see a copyright notice on their works?
A: The majority of the time (nodding).
Q: But you have seen works that do not have the copyright notice on them, correct?
A: I'm certain I have seen an architect's work without a copyright expression on there. But for the majority of cases, most careful architects and most architects who wish to preserve their copyright, you know, myself included, we'll invoke it right on the page. For example, if I'm issuing a set of plans, just anecdotally, for a client to look at, you know, if I don't intend for them to go to the permit office, I'll write on there or stamp it on there "for client review only" or "for pricing only" or "for bid only" or for whatever. If I issue a set that's for, you know, any particular limited purpose, I'll put that limitation on the plan. So I'm just essentially -- since you brought up a issue of copyright invocation --
Q: Right, sure.
A: I bring up all the other kinds of endorsements that could go on the plan. And if I am concerned about a set of plans and its possible usage other than the intended usage, I'll invoke an expression of limitation right there.

These facts did not occur in the *Johnson* case on which plaintiffs rely. In *Johnson*, there was no license for the subsequent architect to act within because the AIA provisions used precluded the existence of such a license. *Johnson v. Jones, 149 F.3d 494 (1998 7th Circuit).* In this case, like *Shaver,* no similar AIA language was used in the contract to preclude a subsequent architect to act within the scope of the license or to accomplish the intended purpose of the contract. *I.A.E, Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996).* The scope of the contract in this case includes the "permit review process". *Exhibit 1, page 1, Phase 2, number 1, line 3.* Mr. Way acted only to cause the plans to once again be permitted after Hackley wrongfully voided the permit. He did not trace the drawings nor eliminate Hackley's name from them. Hackley's name was still very clearly visible to the permit office. Also, unlike *Johnson*, the permit office refused to issue a permit on the plans Way approved. Further, Hackley did not have any copyright symbols on the drawings to alert defendant Way and defendant Way did not profit from this in that it ended costing him more than $2,500[30] (Maryland Board of Architects on Hackley's complaint, in that Way did not have adequate supervisory control over drawings). *State Board v. Clark, 114 Md.App. 247, 260-261 (1997).*

Also, it should never be forgotten, that **none** of this would have occurred *but for* plaintiff Hackley's fraudulent rendering bill, refusal to breakdown this and other bills, wrongful withholding or theft of LVL X's chandelier, extortion by pulling LVL X's PGP

---

Q: Sure.
A: And most careful architects will do the same.
Q: Sure. And for pricing purposes, or to put a notation for pricing purposes or for permit purposes or for some specific purpose, is that the same as a copyright notice?
A: Is it the same?  No, it's just, it's just sort of a careful way of publishing or allowing it to be known what the intended use for the plans is.
[30] Jeffrey Way's Deposition, page 26, lines 19-22, page 27, lines 1-7.
Q: You testified you received twelve hundred dollars, but out of this whole occurrence, isn't true that it actually cost you twenty-five hundred dollars?
A: It cost me more than that.
Q: More than that? A: Yes, sir.
Q: So you haven't profited from … this? A: No, I have not profited from this, by no stretch of the imagination.

permit, and interference with the very right that Hackley sold to LVL X, all while LVL X was under a stringent lease to complete construction in a hurried pace. Because of Hackley's wrongful and malicious conduct, LVL X could not continue with Hackley as its architect. Not only did the permit office reject the drawings Way reviewed, none of the permit office employees were confused over Jeff Way signing and sealing the plans for permit purposes.[31]

---

[31] Behdad Kashanian, p.6,13-18, p.10,13-14, p.26,14-22; p.27,1-2; p.31,13-22; p.32,1-10.
Q: And what position do you have with the permit office?
A: I head the Engineering Plans Review Section.
Q: And how long have you held that position?
A: Two years and probably nine months.
Q: You would not have in your function here at the Permit Office responsibility regarding pages A-1 – or I think you are in the structural department as well?
A: Yes. All of this is reviewed by us, A through Z.
Q: Did you ever see anything or hear anything which caused any confusion on your part that Mr. Hackley was claiming authorship of those plans?
A: No.
Q: That's a no?
A: Yeah.
Q: And your answer goes to anything that would likely cause confusion. I believe you're saying that you weren't confused, correct?
A: Correct.
Q: And when Mr. johns was just asking you about looking at Michael Hackley's plans, was there any likelihood to be confusion as to who the architect was? Did your answer – and I believe your answer was no, there was no likelihood of confusion? A: There was no.
Q: Were you answering as to the Michael Hackley plans or were you answering that question to any plans with Jeffrey Way's signature and seal on them?
A: When Mr. Jeffrey Way sealed the plans, we had all sets over at the Permit Office and very quick glance, checking the both sets. You know, we looked at them very quickly, did not do a great deal of going into too much detail. We looked at them very quickly to see if the sheets are the same and if there are any changes that he just, you know, give you a hint on real quickly, and no, there were no confusions that the plans are the same.

Deposition of Suzanne Hall, page 15, lines 9 through 22; page 16, line 1; page 25, lines 10-20.
Q: How long have you worked at the Permit Office?
A: Twenty-eight years.
Q: What's your position here?
A: I'm a permits supervisor.
Q: … and was there any confusion in your mind ever that, Mr. Hackley was claiming them as his plans?
A:  In my mind. Q: Yeah.
A: I can't say whether they were his or not. I mean as far as I'm concerned, they were his.
Q: And so you weren't confused?
A: **I wasn't confused.**
Q: **You weren't confused? A: Nope.**

Deposition of Malinda Steward, page 4, lines 15 through 19; page 90, lines 13 through 16.
I am the section head for permits and information management section … since January, 2001.
To the best of my judgment, all four sets have **Mr. Hackley's title block so there was no reasons for me to assume that he did not have some involvement with those plans.**

There is no evidence of actual confusion in this case. *Johnson v. Jones, 149 F.3d 494, 502-03 (1998 7th Circuit).* The record and depositions of the above permit office employees also shows that they exercise a high degree of sophistication and care at the permit office. The permit office personnel are experts at reviewing drawings. They could clearly see Mr. Hackley's title block on all four sets of the PGP drawings. Mr. Kashanian's testimony is very cogent on this point. He states: "[w]hen Mr. Jeffrey Way sealed the plans, we had all sets over at the Permit Office and very quick glance, checking the both sets. You know, we looked at them very quickly, did not do a great deal of going into too much detail. We looked at them very quickly to see if the sheets are the same and if there are any changes that he just, you know, give you a hint on real quickly, and no, there were no confusions that the plans are the same." Ms. Steward specifically referred to "Hackley's title blocks" on each of the four sets of drawings. A thin line or lines through Hackley's name didn't stop anyone from seeing it. Again, if it was defendants' intent to claim ownership of the plans, they would have completely and thoroughly removed Hackley's title blocks from the plans. Perhaps, as plaintiffs' alluded to, CFG put a line through Hackley's name because he was no longer the architect of record. If that was the reason, it is entirely different than claiming authorship.

On 05-20-2002, Hackley's chronological summary of invoices totaled $25,347.13. *(Exhibit 10).* Deleted from this list is Hackley's invoice to be retained for Paramus Park. Hackley clearly could not expect LVL X to retain him for another project after Hackley mailed to LVL X a fraudulent $8,000 bill, refused to provide it with a breakdown, stole its chandelier, and voided its permit. The $2,500 Paramus Park invoice should clearly be deleted. For the aforesaid reasons, the $8,000 fraudulent rendering bill should also be deleted not only because it is a fraudulent bill, but Hackley delivered the rendering after two of the stores were already constructed. Further, the rendering does not look like the LVL X stores. Hackley also

refused to provide a breakdown or support for the two contract administration invoices for $750 and $625. *Exhibit 2, para. 8.* The $7,500 remaining balance due for the PGP drawings and the $2,500 initial retainer that LVL X should both clearly be deleted after Hackley voided LVL X's PGP permit. *Exhibit 2, para. 8.* The two chandeliers on the invoice summary should also be deleted because they were never purchased. *Exhibit 2, para. 8.* Shown as a credit is the Tyson's Corner chandelier that Hackley withheld or stole and which LVL X no longer needs. After recalculating Hackley's invoice summary with these well grounded adjustments and credits, LVL X **overpaid, not underpaid,** Hackley, by about **$14,100.00**,[32] yet plaintiffs are seeking equity. This amount does not include damages Hackley caused LVL X with his misconduct. Defendants respectfully request summary judgment as LVL X overpaid Hackley.

Defendants also seek summary judgment through their Rule 16(f) sanctions motion in that Hackley refused to testify on matters related to his claim for damages.[33] In their

---

[32] Hackley's 05-20-2002 summary of invoices. (*Exhibit 10):*

| | |
|---|---:|
| Alleged total amount due less adjustments | $25,347.13 |
|    PGP (Hackley voided permit) | 75.17 |
|    Paramus Mall retainer *(Exhibit 15)*: | 2,500.00 |
|    PGP (Hackley voided permit) | 12.60 |
|    Fraudulent electronic drawings (rendering) invoice: | 8,000.00 |
|    Construction Administration (no records to support invoice): | 750.00 |
|    PGP drawings (Hackley voided permit) | 7,500.00 |
|    Construction Administration (no records to support invoice): | 625.00 |
|    Paramus Park Mall chandelier (never purchased): | 1,928.96 |
|    PGP chandelier (never purchased): | 1,928.96 |
|    PGP federal express charges (Hackley voided permit) | 31.36 |
|    PGP permit facilitation (Hackley voided permit) | 450.00 |
|       *Amount due after adjustments* | 1,545.08 |
| *Less Credits:* | |
|    LVL X's $10,000 payment *(Exhibit 4):* | 10,000.00 |
|    LVL X's $2,500 retainer for PGP drawings (Hackley voided permit) | 2,500.00 |
|    Hackley's theft of LVL X's Tyson's Corner chandelier *(Exhibit 16)*: | 1,928.96 |
|    PGP permitting fee (Hackley voided permit) *(Exhibit 23)*: | 1,215.00 |
|       *Amount LVL X has overpaid Hackley* | $14,098.88 |

[33] Hackley's deposition, page 253 (lines 14 through 22) and page 254 (lines 1 through 3):
Q: How much did you receive in settlements from Trouton and CFG?
MS. WESTERVELT:  Objection.  MR. JOHNS:  It's relevant to damages.
MS. WESTERVELT:  I'm instructing you not to answer.
MR. JOHNS:  Well, okay. Then don't bring any damage claims if you're not going to testify.

pleadings, plaintiffs alleged that the defendants jointly engaged in copyright infringement by stating that, for example, LVL X **and** CFG submitted and re-submitted a request for a permit using Hackley's drawings. *Amended Complaint, page 3, beginning on line 3.* Plaintiffs also alleged that LVL X, CFG, **and** Jeffrey Way, together, infringed on Hackley's copyright. *Id. at page 3, line 10.* In paragraph 45 (page 13), Hackley requested the court to order the "**defendants**" to pay $250,000 in damages for defendants' alleged misconduct relative to both Counts I and II. Plaintiffs knew the nature of their allegations when defendants deposed Hackley. They also knew that they had settled with defendant CFG. Defendants were seeking to establish the amount that CFG paid to settle in that such amount would offset a damage award, if any, against themselves. *See, e.g., U.S. v. Bronston, 453 F.2d 555 (1971).*

Not only did Hackley refuse to testify about damages, as aforesaid, plaintiffs are not claiming any damages in each of their responses to defendants' interrogatories on damages:

*Interrogatory:* Describe in detail each and every element of damage you are claiming; how you compute each and every element of damage; and, identify each and every document, tangible thing, and other evidentiary material on which your computation is based, including, but not limited to, materials bearing on the nature and extent of damages.

*Response:* This interrogatory is objected to on the ground that it is compound and overly complex, unduly broad and burdensome, and premature and speculative pending an accounting. Without waiving these objections, a response to this interrogatory will be forthcoming pending discovery.

Defendants' had LVL X's PGP store surveyed to determine if any of the sales are attributed the alleged infringement. As defendants' expert stated: "The conclusion that I draw from these findings is that neither the physical characteristics of the storefront nor those of the sales counter made any material contribution to drawing customers into the store on the first or subsequent visits, not to encourage them to purchase merchandise once inside the store." *Exhibits 24A, page 3 and 24B; 25A and 25B.* Summary judgment on the issue of damages is warranted because defendants did not benefit from any of the alleged infringements in this

case, plaintiffs refused to testify about matters concerning damages in this case, because plaintiffs do not claim any damages in their interrogatory answers, and because survey results show that gross sales of LVL X's PGP store are not attributable to the alleged infringements. *Ex. 22. See, N.W. Airlines v. American Airlines, 870 F.Supp. 1504, 1512-3(D. Minn. 1994).*

WHEREFORE, defendants respectfully request the court to deny plaintiffs' motion for summary judgment and to grant defendants' motion for summary judgment.

Respectfully submitted,

_____/s/_____
Christopher M. Johns, Esq.
P.O. Box 975, Laurel, MD 20707
Telephone: 301-674-6900
Facsimile: 301-540-5901
Bar No.: 15677

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 07-29-03, I caused a copy of the foregoing paper to be served to: Deborah Westervelt, 10 North Calvert Street, Suite 153, Baltimore, MD 21202 and Terrence McShane, 1211 Connecticut Avenue, N.W., Suite 425, Washington, D.C. 20036.

_____/s/_____
Christopher M. Johns