IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL HACKLEY, et al. | : | |
|     Plaintiffs | : | |
| vs. | : | CASE NO. JFM 02-CV-3363 |
| LVL X, INC., et al. | : | |
|     Defendants | : | |

REPLY TO OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION

Defendants LVL X, Inc., John Lee, and Jeffrey Way hereby replies to plaintiffs' opposition to defendants' motion for summary judgment, and in reply states as follows:

In their opposition to defendants' motion for summary judgment, plaintiffs seem to avoid the undisputed fact that LVL X had a nonexclusive license to use the PGP drawings. Plaintiffs briefly discussed LVL X's license to use the drawings on pages 13 and part of 14, and the understanding between the parties on pages 21 and part of 22 of their opposition. The cases plaintiffs attempt to rely on, however, analyze the contract between the parties in much greater depth in that the parties understanding or contract is of primary importance in deciding on whether defendant had a license to use the drawings at issue in each case.[1] *Nelson-Salabes v. Morningside Development*, 284 F.3d 505, at 514 (4th Cir. 2002); *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996); *Johnson v. Jones*, 149 F.3d 494 (7th Cir. 1998).

It is an undisputed fact that although there was no written contract between the parties for PGP, *Hackley Deposition Exhibit 30B* which is *Defendant's S.J. Motion Exhibit 1* represents the contractual understanding between Hackley and LVL X concerning PGP. *S.J. Exhibit 2, para. 9*. Plaintiffs do not contest this undisputed fact in their opposition. In further support of this undisputed fact, defendants submit further testimony on this by Hackley.[2]

---

[1] The "background" in the opposition, pages 2 to 5, also leaves out many material facts.
[2] Hackley, page 402, line 9, through page 405, line 22:
Q: Mr. Hackley, you've been handed what's been labeled Exhibit 30B which you were asked about yesterday.
A: Yes.
Q: Could you state quickly what this is?

It is also beyond dispute that the scope of the contract is determined by the expressed provisions of the contract. Under phase I, a preliminary design for the store was to be developed and was to be distributed to LVL X and others for their approval and was to be used to make construction drawings. Under phase II, construction drawings were to be made and distributed for LVL X to use to construct the store. Beyond that, Hackleys future involvement was expressly to be at LVL X's, and not at Hackley's, option. *S.J. Exhibit 1.*

It is further beyond dispute that their unconditional termination clause is consistent with this analysis. It clearly does not restrict LVL X's use of drawings after Hackley is terminated and is not involved with the construction of the store. *Id.* It is beyond dispute, that without restrictions, Hackley delivered the PGP drawings to LVL X and to the permit office to obtain a permit, or permission, for LVL X to use the PGP drawings to construct its

---

A: It's dated 18th of May 2000. This is one of the standard contracts that I used with John Lee and Level 10 over the course of the years that I did business with them.
Q: Could you please turn to page 3. Could you read the item under the Termination at the top of the page?
A: It says: This agreement may be terminated by either party upon ten-day written notice. The architect shall be compensated for all services and expenses up to the date of termination. In addition to the retainer plus a standard 15 percent termination fee for the order, close-out and documentation of professional effort to the date of termination.
Q: You testified earlier when Mr. Johns asked you about that, this was a course of conduct?
A: Yes. By the way, this was signed by John Lee. At least this scribble looks like his signature.
Q: Did you have an understanding with Level 10? A: About what?
Q: -- regarding termination? A: Yes –
Q: You testified yesterday that I believe Mr. Johns showed four contracts for stores that you did for Level 10? A: Yes, Exhibit 30B.
Q: I believe you testified yesterday that you did not have written contracts for the more recent stores? A: Yes.
Q: Mr. Johns asked you a number of questions about these agreements that were in writing and I'm asking you another question which is regarding the termination clause. A: Okay.
Q: You just read the termination clause. A: Should I reread it?
Q: No. Did Mr. Johns yesterday ask you if you had a course of conduct with Level 10 regarding these agreements, and I'm asking that same question for the termination clause? A: Yes, I did.
Q: The next clause?
A: It says: Construction cost. No fixed limit of construction cost has been or will be established as a condition of this agreement.
Q: And what does that clause mean?
A: It means that I can't guarantee construction costs for a particular space.
Q: And John Lee signed this agreement?
A: Yes, John Lee signed this agreement with the termination clause and the construction cost clause in the agreement.

store at PGP *(S.J. Exhibit 3)*. With a check, LVL X paid Hackley for a PGP permit, or for permission to use the drawings to construct a store at PGP, and he cashed it. *S.J. Exhibit 23*.

It is beyond dispute that the contract between the parties does not contain any AIA or other language that in any way restricts LVL X's use of the drawings, nor did Hackley state any restrictions on the drawings themselves, or use a "©" symbol, restricting use. *S.J. Ex. 2, para. 1*. It is beyond dispute that Hackley used LVL X's corporate name, trade name and pending trade mark, to title the drawings as "LVL X" on the copyright application for the PGP drawings *(S.J. Exhibit 5)* and used the address where the drawings were intended to be used. *Id.* It is beyond dispute that the contract, which Hackley drafted, does not contain a condition precedent concerning payment, or language specifically requiring LVL X to make full payment before LVL X can use the drawings to construct its store. *S.J. Exhibit 1*.

It is beyond dispute that on 05-28-2002, LVL X paid Hackley $10,000. *S.J. Exhibit 4*. Lee testified that all of the items that the $10,000 paid for were not listed on the check because there were to many items to list. Compare *Plaintiff's Exhibit U, page 183, lines 4 to 8* compared with the 13 un-deleted items on *S.J. Exhibit 10* on which LVL X paid. Hackley clearly did not deny that he currently had another attorney to collect on the rendering, *a fortiori* LVL X paid Hackley for the PGP drawings.[3] It is beyond dispute that Hackley sent LVL X a letter dated June 7, 2002, in which using any standard of clear and objective reading, Hackley clearly listed the rendering invoice as an "OUTSTANDING INVOICE" and stated that, "[w]e require payment in full for that invoice", *a fortiori* LVL X paid

---

[3] Hackley's deposition, page 300 (lines 17 through 22) and page 301 (lines 1 through 5):
Q: You still have an attorney-client relationship with Mr. Dore; is that correct? A: Correct.
Q: He's retained to collect money for the rendering, correct?
A: I have an attorney-client relationship with him.
Q: For that purpose? A: Maybe for that purpose and other purposes.

Hackley for the PGP drawings. **Nowhere in this letter did Hackley list the PGP drawings as an outstanding invoice**, *a fortiori* LVL X paid for the PGP drawings. *S.J. Exhibit 14.*

Despite the fact that Hackley had an on going relationship with LVL X,[4] and contrary to the plaintiffs' characterization of the contract on pages 21 and 22 of their opposition, Hackley's continued future involvement with the construction phase of the PGP store under "Phase Three" and the "Additional Services" parts of the contract was expressly and is clearly stated to be at LVL X's, and not at Hackley's, option. *S.J. Exhibit 1. Nelson-Salabes v. Morningside Development, 284 F.3d 505, at 514 (4th Cir. 2002).* Furthermore, it was Hackley's own conduct, i.e. making a false rendering bill, refusing to provide a requested breakdown of bills, withholding LVL X's chandelier, and pulling its permit, that made it impossible for LVL X to have an on going relationship with Hackley as its architect. It is also undisputed that **LVL X paid Hackley for a permit to use the PGP drawings to construct its store at PGP and Hackley cashed LVL X's check.**[5] *S.J. Exhibits 3 and 23.*[6]

On page 24 of their opposition, plaintiffs state that their "**first knowledge**" of defendants alleged infringement damages survey was upon their receipt of defendants' cross motion for summary judgment. To the contrary, defendants timely made expert disclosures to plaintiffs of their survey experts and as to their preliminary findings on 06-06-2003 and defendants repeated the same information on their supplementary disclosures that defendants made to plaintiffs just three days later, on 06-09-2003, or about two months

---

[4] Defendants maintain their contention that LVL X, not John Lee, had a business relationship with Hackley.
[5] Hackley deposition, page 168, lines 13 through 22.
Q: I'm handing you what's been market as Exhibit 43. Describe what it is. (*S.J. Exhibit 23*). A: It's a check.
Q: What's it a check for? A: It says "Permitting fee, PGP."
Q: And that was a check from Level X to you; correct? A: Correct.

[6] On page 22 of their opposition, plaintiffs incorrectly states that the architect in *Shaver* was paid. To the contrary, on page 778, key 14, Shaver specifically argued that there was no license to use the drawings because he was not fully paid. *Id.* However, the court rejected this argument because their was no condition precedent in the parties contract, or language specifically requiring full payment before the drawings could be used. *I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996).*

4

before defendants filed their cross motion for summary judgment. *Exhibit 26 (reply exhibit).* Moreover, prior to 06-26-2003, defense counsel discussed expert depositions with plaintiffs' counsel and plaintiffs' counsel stated that she did not want to depose any other defense experts other then defendants' architect. *Exhibit 27, page 2, last paragraph (reply exhibit).*

Defense counsel has repeatedly written plaintiffs' counsel in an attempt to schedule, through plaintiffs' counsel, to have plaintiffs' copy service to pick up documents. *Exhibit 28 (reply exhibit).* However, plaintiffs never acted on these attempts, despite plaintiffs' repeated complaints that they did not have documents that they made in their filed court papers. Moreover, contrary to plaintiffs' assertions on page 23 of their opposition, plaintiffs refusal to testify as to the amounts received in settlements from co-defendants does constitute a refusal to testify on matters related to damages. Defendants previously corrected the case cite on 08-12-2003 on page 5 in reply to plaintiffs' opposition to defendants' Rule 16(f) motion for sanctions. Defendants mistakenly cited to page 555, instead of the case at 552, *Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp., 453 F.2d 552 (1972).* At Hackley's deposition, despite defendants telling the plaintiffs that the questions asked concerned damages, Hackley was nevertheless instructed not to answer the questions.[7]

Further, defendants did not misrepresent plaintiffs' interrogatory answers concerning damages as is alleged on page 24 of plaintiffs' opposition. Their answer is clearly deficient on its face. Plaintiffs are suing defendants, but refuse to answer questions on damages.[8]

---

[7] Hackley, page 253 (lines 14 through 22) and page 254 (lines 1 through 3):
Q: How much did you receive in settlements from Trouton and CFG?
MS. WESTERVELT: Objection.  MR. JOHNS:  It's relevant to damages.
MS. WESTERVELT: I'm instructing you not to answer.
MR. JOHNS:  Well, okay. Then don't bring any damage claims if you're not going to testify.

[8] *Interrogatory:* Describe in detail each and every element of damage you are claiming; how you compute each and every element of damage; and, identify each and every document, tangible thing, and other evidentiary material on which your computation is based, including, but not limited to, materials bearing on the nature and extent of damages. *Response:* This interrogatory is objected to on the ground that it is compound and overly

Plaintiffs' answer to defendants' interrogatory concerning damages was: *"[w]ithout waiving these objections, a response to this interrogatory will be forthcoming pending discovery.* However, no discovery response on damages was forthcoming while suing the defendants. Further, stating each element of damage they are claiming does not require an accounting. Also, as defendants showed in their motion, plaintiffs' are not entitled to equitable relief. Plaintiffs did not attempt any discovery relative to an accounting they allegedly seek.

Contrary to plaintiffs allegations concerning fees for the rendering on page 14 of their opposition, the contract between the parties does provide for standard hourly rates for phase III and additional services. *Defendant's S.J. Motion Exhibit 1, page 2.* Contrary to plaintiffs' allegation on page 16 of their opposition, attorney James Dore declined to sue LVL X for copyright infringement after he had discussions with counsel. Finally, the permit that LVL X paid Hackley for was not rendered moot by LVL X as alleged on pages 3 and 20 of plaintiffs' opposition, To the contrary it remained viable until Hackley pulled it.[9]

Respectfully submitted,
\_\_\_\_\_/s/_____
Christopher M. Johns, Esq.
P.O. Box 975, Laurel, MD 20707
Telephone: 301-674-6900
Facsimile: 301-540-5901
Bar No.: 15677

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 09-04-03, I caused a copy of the foregoing paper to be served on: Deborah Westervelt, 10 North Calvert Street, Suite 153, Baltimore, MD 21202 and Terrence McShane, 1211 Connecticut Ave., N.W., Suite 425, Washington, D.C. 20036.
\_\_\_\_\_/s/_____
Christopher M. Johns

---

complex, unduly broad and burdensome, and premature and speculative pending an accounting. Without waiving these objections, a response to this interrogatory will be forthcoming pending discovery.

[9] Deposition of Malinda Steward, page 81, lines 1 through 6.
Q: Okay. But 00 was still in play until receiving Mr. Hackley's letter?
A: Yes.
Q: And was still a viable permit until the cancellation pursuant to Mr. Hackley's letter?
A: Yes.