IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL HACKLEY, et al.           :
    Plaintiffs,               :
vs.                               :   JFM 02 CV 3363
LVL X, INC., et al.               :
    Defendants.               :

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON COUNT II

    The Lanham Act (Count II) imposes liability on "[a]ny person who … in connection with any goods or services … uses in commerce … any false designation of origin … which … is likely to cause confusion, or to cause mistake, or to deceive … as to the origin … of his or her goods, services, or commercial activities." *15 U.S.C. Section 1125(a)(1)(A)*. The Lanham Act is aimed at "unfair competition." *Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998)*.

    Defendants are entitled to summary judgment on Count II for the following reasons. First, it was not unfair competition for LVL X to use the PGP drawings to obtain a permit in that it is an undisputed fact that LVL X had a license to use the PGP drawings.[1] The scope of LVL X's license or contract with Hackley[2] clearly included permit services or the "permit

---

[1] This court previously granted judgment on Count I, finding that LVL X had a license to use the PGP drawings.

[2] *Exhibit 1* and Hackley's deposition, page 303 (lines 5-7), page 129 (lines 1-4) and page 130 (18-20):
Q: You wrote the … contract proposals, [Deposition] Exhibit Number 30; isn't that right? A: Yes.
Q: … These proposals represent an understanding between … you and Level X? A: Yes.

  Hackley's Depositions, p. 402, lines 9-16, p. 403, lines 5-8), p. 404 (line 2-13): Hackley's attorney:
Q: Mr. Hackley, you've been handed what's been labeled **Exhibit 30B** which you were asked about yesterday.
A: Yes.
Q: Could you state quickly what this is?
A: It's dated 18th of May 2000. This is one of the standard contracts that I used with John Lee and Level 10 over the course of the years that I did business with them.
Q: You testified earlier when Mr. Johns asked you about that, this was a course of conduct?
A: Yes. By the way, this was signed by John Lee. At least this scribble looks like his signature.
Q: You testified yesterday that I believe Mr. Johns showed four contracts for stores that you did for Level 10?
A: Yes, Exhibit 30B.
Q: I believe you testified yesterday that you did not have written contracts for the more recent stores? A: Yes.
Q: Mr. Johns asked you a number of questions about these agreements that were in writing and I'm asking you another question which is regarding the termination clause. A: Okay.
Q: You just read the termination clause.

review process". *Exhibit 1, page 1, Phase 2, number 1, line 3.* There was no AIA language, or any other type of language, in Hackley and LVL X's contract precluding a subsequent architect to act within the scope of LVL X's license to use the PGP drawings to obtain a permit or to otherwise accomplish the intended purpose of the contract. *I.A.E, Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996) and Johnson v. Jones, 149 F.3d 494 (1998 7th Circuit).* LVL X's contract with Hackley gave LVL X the right to use the drawings to obtain a permit, either with or

---

A: Should I reread it?
Q: No. Did Mr. Johns yesterday ask you if you had a course of conduct with Level 10 regarding these agreements, and I'm asking that same question for the termination clause?
A: Yes, I did.
Q: And John Lee signed this agreement?
A: Yes, John Lee signed this agreement with the termination clause and the construction cost clause in the agreement.

Hackley, page 402, line 9, through page 405, line 22:
Q: Mr. Hackley, you've been handed what's been labeled Exhibit 30B which you were asked about yesterday. A: Yes.
Q: Could you state quickly what this is?
A: It's dated 18th of May 2000. This is one of the standard contracts that I used with John Lee and Level 10 over the course of the years that I did business with them.
Q: Could you please turn to page 3. Could you read the item under the Termination at the top of the page?
A: It says: This agreement may be terminated by either party upon ten-day written notice. The architect shall be compensated for all services and expenses up to the date of termination. In addition to the retainer plus a standard 15 percent termination fee for the order, close-out and documentation of professional effort to the date of termination.
Q: You testified earlier when Mr. Johns asked you about that, this was a course of conduct?
A: Yes. By the way, this was signed by John Lee. At least this scribble looks like his signature.
Q: Did you have an understanding with Level 10? A: About what?
Q: -- regarding termination? A: Yes –
Q: You testified yesterday that I believe Mr. Johns showed four contracts for stores that you did for Level 10?
A: Yes, Exhibit 30B.
Q: I believe you testified yesterday that you did not have written contracts for the more recent stores? A: Yes.
Q: Mr. Johns asked you a number of questions about these agreements that were in writing and I'm asking you another question which is regarding the termination clause. A: Okay.
Q: You just read the termination clause. A: Should I reread it?
Q: No. Did Mr. Johns yesterday ask you if you had a course of conduct with Level 10 regarding these agreements, and I'm asking that same question for the termination clause? A: Yes, I did.
Q: The next clause?
A: It says: Construction cost. No fixed limit of construction cost has been or will be established as a condition of this agreement.
Q: And what does that clause mean?
A: It means that I can't guarantee construction costs for a particular space.
Q: And John Lee signed this agreement?
A: Yes, John Lee signed this agreement with the termination clause … in the agreement.

without Hackley's involvement *(Exhibit 1, page 2, phase 3 "Optional")*. In addition thereto, their contract clearly gave LVL X the right to terminate its contract with Hackley with just ten (10) days written notice. *Exhibit 1 (page 3, "Termination")*. It was clearly not a Lanham Act violation, nor unfair competition, for defendants to re-submit the drawings to obtain a permit.

Second, defendants are entitled to summary judgment on their unclean hands defense. It is beyond dispute that Hackley interfered with LVL X's license to use the PGP drawings by voiding LVL X's permit to use the PGP drawings. It is beyond dispute that LVL X paid Hackley for a permit for it to use the PGP drawings.[3] After obtaining a permit for LVL X, it is also beyond dispute that Hackley intended to void it as he told Chalk that he was going to pull LVL X's PGP permit. *Exhibit 2, para. 13*. It is further dispute that Hackley made contact with the permit office and demanded that it void LVL X's PGP permit. And, furthermore, it is beyond dispute that it was Hackley's demand that caused the permit office to void the permit.[4]

In Count II , Hackley is essentially complaining that it was unfair competition for LVL X to seek a permit using the PGP drawings. However, LVL X had a license to use the PGP drawings to obtain a permit with or without Hackley's involvement. Hackley breached his contractual relationship with LVL X when he caused the permit office to void LVL X's PGP permit. And, Hackley interfered with the LVL X's license to use the PGP drawings when he

---

[3] Hackley deposition, page 168, lines 13 through 22 and *Exhibit 3*.
Q: I'm handing you what's been market as Exhibit 43. Describe what it is.
A: It's a check.
Q: What's it a check for? A: It says "Permitting fee, PGP."
Q: And that was a check from Level X to you; correct? A: Correct.

[4] Malinda Steward's depo., page 80 (18 through 22), page 81 (lines 1 through 6) and *Exhibits 4 and 5*:
Q: … the permit that was cancelled by Mr. Hackley per his June 21 letter --. A: Yes.
Q: -- it was still necessary to cancel out 00; is that correct?
A: We could respond to Mr. Hackley's request since he made the original application, and that's what we did.
Q: Okay. But 00 was still in play until receiving Mr. Hackley's letter? A: Yes.
Q: And was still a viable permit until the cancellation pursuant to Mr. Hackley's letter? A: Yes.

caused the permit office to void LVL X's PGP permit. If it were not for Hackley's misconduct, or unclean hands, defendants would not have had to request another PGP drawings permit under very stringent lease time constraints. *Keystone v. Excavator, 290 U.S. 240, 245 (1933).*

Third, defendants are entitled to summary judgment on Count II because the defendants re-submitted the PGP drawings to the permit office for the sole purpose of obtaining another permit and not with the purpose to deceive anyone into believing that the drawings did not allegedly originate with Hackley. It is beyond dispute that defendant Jeffrey Way reviewed the PGP drawings, signed and sealed the drawings for permit purposes only, and not to claim ownership of the drawings.[5] Way wrote above his seal "For Permit Only". *Exhibit 6.* Way placed his seal on the drawings to comply with Maryland Code which required him to do so: "[b]efore a licensed architect … submits to a public authority any final drawing … required for the issuance of a building permit, the licensed architect who prepared **OR APPROVED** of the document **SHALL SIGN, SEAL**, and date the document (emphasis added)." *Md. Bus. Occ. & Prof. Section 3-501* and *State Board v. Clark, 114 Md.App. 247, 260-261, 689 A.2d 1247 (1997).* As the record reflects, after Way did so, Way gave the plans to Commercial Finish Group ("CFG"). CFG is an independent contractor. Unbeknownst to LVL X, Lee and Way,

---

[5] Jeffrey Way's deposition, page 9, lines 18-22; page 10, lines 1-22; page 11, lines 1-15.
Q: So the mall management person told you that John Lee would be calling you, and then John Lee called you. And could you explain what occurred in that first contact?
A: Mr. Lee informed me … that he had some plans, that he was endeavoring to get a building permit from Prince George's County, DER, I guess, which stands for Department of Environment or Resources, or something like that. They informed him that he needed to have his plans reviewed and sealed by an architect, and that's what he informed me of, that's what he requested of me, and that's what he asked if I had the capability of doing. I said possibly, I guess we can see what you have. And that was the nature of our first conversation.
 Jeffrey Way's deposition, page 18, lines 13-22; page 19, lines 1-22.
Q: And what did you do after you were given the plans?
A: I took the plans, I reviewed them, and after I was completed with the review, after I determined in my opinion that the plans, you know, conformed to the building codes … At that point I signed and sealed the plans, but I put a superscription or subscription, I either wrote it above or beneath my seal on the plan, it said for permit review only or for permit purposes only, something like that, and I affixed my signature, my initial signature thereto.
Q: And then who did you return the drawings to? I do recall meeting with -- I'm sorry. The record, I'm sure, will reflect whatever his name was, but the general contractor … Could it have been Ron Reese?
A: That sounds familiar, and I gave the plans back to him.

CFG put lines through Hackley's name, but in doing so, no one redacted, nor replaced, Hackley's name, as it was still clearly visible. No where does the record indicate that LVL X, Lee, nor Way, put lines through, replaced, nor redacted Hackley's name. None of the defendants traced the PGP drawings, nor eliminated Hackley's name from the PGP drawings. If it were defendants' intention to claim origin, they would have completely and thoroughly removed Hackley's title blocks from the drawings. Perhaps CFG put a line through Hackley's name because he was no longer the architect of record. CFG has already settled this litigation with Hackley by CFG paying Hackley $15,000. It is also beyond dispute that Hackley did not use a "©" symbol, nor state any restrictions or prohibitions, on the PGP drawings placing defendants on notice that they were prohibited from re-submitting the PGP drawings.[6] *Exhibit 6.* Defendants are entitled to judgment because they did not claim origin of the PGP drawings.

---

[6] Jeffrey Way's deposition, p. 21, 6-22; p. 22, 1-17; p. 26, 10-18; p. 28, 17-22; p. 29; 30; 31, 1-12.
Q: Okay. When John Lee asked you to provide this service, did he tell you that Level X owned the drawings?
A: That was my understanding, yes.
Q: And was it your understanding because of something that Mr. Lee said or someone else from Level X said?
A: Well, when I looked at the drawings they seemed to exhibit, in my opinion, you know, ownership. I did not see anywhere in the plans when I was reviewing them, I didn't see anything that expressed that the plans were not owned by the national brand… And I presumed, based on, you know, their bringing the plans to me and that Level X was very large in terms of, you know, its typeface or the lettering on the cover page, and it seemed to me that they were their plans. I mean, I didn't question that they were not their plans.
Q: Mr. Way, what, if any, copyright markings that one would typically see did you see on the plans?
A: I don't recall seeing any particular or explicit, you know, references of copyright. You mean the tie-back to the previous plan preparer?
Q: Well, like a "C" or anything like that. Do you recall? You don't seeing that, do you?
A: No, I do not.
Q: Sure. Then one other question as a follow-up to Mr. John's question about the copyright notice. Do you put the copyright notice on the plans that you create yourself?
A: Yes, I do. It depends on the nature of it. For example, if I'm doing it -- if someone has hired me to do a design for a house or something and it's particularly unique or there are some -- there's something unconventional there that's, you know, is somewhat of an invention, then, you know, I would probably invoke an express copyright on there. If the plans were prepared for an entity that I was serving, even though I'm a registered architect or even just as a plan preparer, if it served a larger entity, then they would probably have me put a copyright that references, you know, the entity, for example, if I was doing something for a corporation, a restaurant, or something like that.
Q: Okay. In your number of years as an architect, I imagine you've had plenty of occasions to view other architects' work; is that correct?
A: I would say a pretty good number of architects' work. I pay more attention to my own.
Q: I'm sure you do. And in reviewing other architects' works, do you always see a copyright notice on their works?
A: The majority of the time (nodding).
Q: But you have seen works that do not have the copyright notice on them, correct?

Fourth, defendants are entitled to summary judgment because there was no likelihood of confusion, or actual confusion, over the fact that the PGP drawings allegedly originated with Hackley. *Johnson v. Jones, 149 F.3d at 502-03 (1998 7th Circuit).* The record and depositions of the permit office employees shows that they exercise a high degree of sophistication and care at the permit office. The permit office personnel are experts at reviewing drawings. They could clearly see Hackley's title block on all four sets of the PGP drawings. Mr. Kashanian's testimony is very cogent on this point. He states: "[w]hen Mr. Jeffrey Way sealed the plans, we had all sets over at the Permit Office and very quick glance, checking the both sets. You know, we looked at them very quickly, did not do a great deal of going into too much detail. We looked at them very quickly to see if the sheets are the same and if there are any changes that he just, you know, give you a hint on real quickly, and no, there were no confusions that the plans are the same." Ms. Steward specifically referred to "Hackley's title blocks" on each of the drawings.[7] Summary judgment is warranted due to a lack of any actual confusion over origin.

---

A: I'm certain I have seen an architect's work without a copyright expression on there. But for the majority of cases, most careful architects and most architects who wish to preserve their copyright, you know, myself included, we'll invoke it right on the page. For example, if I'm issuing a set of plans, just anecdotally, for a client to look at, you know, if I don't intend for them to go to the permit office, I'll write on there or stamp it on there "for client review only" or "for pricing only" or "for bid only" or for whatever. If I issue a set that's for, you know, any particular limited purpose, I'll put that limitation on the plan. So I'm just essentially -- since you brought up a issue of copyright invocation --
Q: Right, sure.
A: I bring up all the other kinds of endorsements that could go on the plan. And if I am concerned about a set of plans and its possible usage other than the intended usage, I'll invoke an expression of limitation right there.
Q: Sure.
A: And most careful architects will do the same.
Q: Sure. And for pricing purposes, or to put a notation for pricing purposes or for permit purposes or for some specific purpose, is that the same as a copyright notice?
A: Is it the same? No, it's just, it's just sort of a careful way of publishing or allowing it to be known what the intended use for the plans is.
[7] Behdad Kashanian, p.6,13-18, p.10,13-14, p.26,14-22; p.27,1-2; p.31,13-22; p.32,1-10.
Q: And what position do you have with the permit office?
A: I head the Engineering Plans Review Section.
Q: And how long have you held that position?
A: Two years and probably nine months.
Q: You would not have in your function here at the Permit Office responsibility regarding pages A-1 – or I think you are in the structural department as well?

And/or fifth, defendants are entitled to summary judgment on Count II because there are no damages even if one were to assume that a there was a Lanham Act violation. None of the defendants profited by the alleged violation. LVL X did not benefit as it is beyond dispute that the re-submitted PGP drawings were rejected by the permit office. *Amended Complaint, page 3, line 13*. Defendant Jeffrey Way also did not benefit in that re-submitting the PGP drawings has cost him more than $2,500.00 [8] as a result of Hackley's complaint to the Maryland Board of Architects which found that Way did not have adequate supervisory control over the PGP drawings. *See, State Board v. Clark, 114 Md.App. 247, 260-261 (1997).* Defendant John Lee did not benefit because defendant Lee was not a party to any of the dealings between Hackley

---

A: Yes. All of this is reviewed by us, A through Z.
Q: Did you ever see anything or hear anything which caused any confusion on your part that Mr. Hackley was claiming authorship of those plans? A: No.
Q: That's a no? A: Yeah.
Q: And your answer goes to anything that would likely cause confusion. I believe you're saying that you weren't confused, correct? A: Correct.
Q: And when Mr. johns was just asking you about looking at Michael Hackley's plans, was there any likelihood to be confusion as to who the architect was? Did your answer – and I believe your answer was no, there was no likelihood of confusion? A: There was no.
Q: Were you answering as to the Michael Hackley plans or were you answering that question to any plans with Jeffrey Way's signature and seal on them?
A: When Mr. Jeffrey Way sealed the plans, we had all sets over at the Permit Office and very quick glance, checking the both sets. You know, we looked at them very quickly, did not do a great deal of going into too much detail. We looked at them very quickly to see if the sheets are the same and if there are any changes that he just, you know, give you a hint on real quickly, and no, there were no confusions that the plans are the same.
  Deposition of Suzanne Hall, page 15, lines 9 through 22; page 16, line 1; page 25, lines 10-20.
Q: How long have you worked at the Permit Office? A: Twenty-eight years.
Q: What's your position here? A: I'm a permits supervisor.
Q: … and was there any confusion in your mind ever that, Mr. Hackley was claiming them as his plans?
A:  In my mind. Q: Yeah.
A: I can't say whether they were his or not. I mean as far as I'm concerned, they were his.
Q: And so you weren't confused? A: I wasn't confused.
Q: You weren't confused? A: Nope.
  Deposition of Malinda Steward, page 4, lines 15 through 19; page 90, lines 13 through 16.
I am the section head for permits and information management section … since January, 2001.
To the best of my judgment, all four sets have Mr. Hackley's title block so there was no reasons for me to assume that he did not have some involvement with those plans.
[8] Jeffrey Way's Deposition, page 26, lines 19-22, page 27, lines 1-7.
Q: You testified you received twelve hundred dollars, but out of this whole occurrence, isn't true that it actually cost you twenty-five hundred dollars?
A: It cost me more than that.
Q: More than that? A: Yes, sir.
Q: So you haven't profited from … this? A: No, I have not profited from this, by no stretch of the imagination.

7

and LVL X and defendant John Lee does not understand why he is a named party in this case. Even if one were to assume that there was some kind of benefit conferred by the re-submission of the PGP drawings to the permit office, Hackley is not entitled to damages, as aforesaid, under defendants' unclean hands defense. The only reason that defendant LVL X had to retain defendant Jeffrey Way was because Hackley wrongfully caused the PGP permit to be voided.

Plaintiffs are not entitled to damages also because of their failure to provide a response on damages. When asked, plaintiffs said that their response will be "forthcoming",[9] but thereafter could not provide a response because there are no cognizable damages. Defendants did not receive any benefit and plaintiffs do not have any actual damages. Further, defendants are entitled to offset damages by settlements plaintiffs have received from co-defendants. This is because in their pleadings, plaintiffs alleged that the defendants jointly engaged in the alleged violation of the Lanham Act by stating that, for example, LVL X **and** CFG submitted and re-submitted a request for a permit using Hackley's drawings. *Amended Complaint, page 3, beginning on line 3.* In paragraph 45 (page 13), Hackley requested the court to order the defendant**s** to pay damages for their alleged Lanham Act violation. Plaintiffs have already received $27,500.00 in settlements from co-defendants CFG and Trouton *(Exhibits 7 and 8)* which more than offsets the zero (0) amount of damages (there being no benefit nor actual damages). *N. West Airlines v. American Airlines, 870 F.Supp. 1504, 1512-3 (D. Minn. 1994).*

WHEREFORE, defendants LVL X, Inc., John Lee and Jeffrey Way respectfully request the Court to grant summary judgment against plaintiffs on Count II of the Amended Complaint.

---

[9] *Interrogatory:* Describe in detail each and every element of damage you are claiming; how you compute each and every element of damage; and, identify each and every document, tangible thing, and other evidentiary material on which your computation is based, including, but not limited to, materials bearing on the nature and extent of damages.
*Response:* This interrogatory is objected to on the ground that it is compound and overly complex, unduly broad and burdensome, and premature and speculative pending an accounting. Without waiving these objections, ***a response to this interrogatory will be forthcoming pending discovery.***

Respectfully submitted,

_____/s/_____
Christopher M. Johns, Esq.
P.O. Box 975, Laurel, MD 20707
Telephone: 301-674-6900
Facsimile: 301-540-5901
Bar No.: 15677

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 01-18-2004, I caused a copy of the foregoing paper to be served to: Deborah Westervelt, 10 North Calvert Street, Suite 153, Baltimore, MD 21202 and Terrence McShane, 1211 Connecticut Avenue, N.W., Suite 425, Washington, D.C. 20036.

_____/s/_____
Christopher M. Johns