Case 1:02-cv-03363-JFM    Document 98-4    Filed 02/02/2004    Page 1 of 5

DEPOSITION OF JEFFREY IVAN WAY
CONDUCTED ON WEDNESDAY, JUNE 25, 2003

1 (Pages 1 to 4)

---

**Page 1**

```
 1       IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MARYLAND
 3   ------------------- X
 4   MICHAEL HACKLEY ARCHITECTS, :
 5   P.C. and MICHAEL HACKLEY    :
 6        Plaintiffs             :
 7     v.                        : Case No.:
 8   JVLX, INC., JOHN LEE,       : JFM 02 CV 3363
 9   COMMERCIAL FINISH GROUP,    :
10   INC., JEFFREY WAY, AND      :
11   JOHN TROUTON                :
12        Defendants             :
13   --------------------- :
14           Deposition of JEFFREY IVAN WAY
15                Baltimore, Maryland
16               Wednesday, June 25, 2003
17                    2:00 p.m.
18   Job No.: 5-18615
19   Pages 1 - 35
20   Reported by: Beatriz D. Fefel, RPR
```

**Page 2**

```
 1        Deposition of JEFFREY IVAN WAY held at the
 2   offices of:
 3
 4        L.A.D. REPORTING
 5        10 North Calvert Street
 6        The Equitable Building, Suite 141
 7        Baltimore, Maryland 21202
 8        (410) 539-3664
 9
10
11
12        Pursuant to agreement, before Beatriz D.
13   Fefel, Registered Professional Reporter and Notary
14   Public of the State of Maryland.
```

**Page 3**

```
                    APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
     DEBORAH WESTERVELT, ESQUIRE
     LAW OFFICES OF ROYAL W. CRAIG, P.C.
     10 North Calvert Street
     Suite 153
     Baltimore, Maryland 21202
     (410) 385-2383

ON BEHALF OF THE DEFENDANTS JOHN LEE AND
JEFFREY WAY:
     CHRISTOPHER JOHNS, ESQUIRE
     ATTORNEY AT LAW
     18961 Highstream Drive
     Germantown, Maryland 20874
     (410) 984-3000
```

**Page 4**

```
              APPEARANCES (CONTINUED)

ON BEHALF OF THE DEPONENT:
     JAMES E. McCOLLUM, JR., ESQUIRE
     JAMES E. McCOLLUM, JR. & ASSOCIATES, P.C.
     7309 Baltimore Avenue
     Suite 117
     College Park, Maryland 20741-1717
     (301) 864-6070
```

(202) 861-3410    (301) 762-8282    (410) 539-3664    (703) 288-0026    (800) 292-4789

**9**

1  Q  And are you licensed in the State of
2  Maryland?
3  A  Yes, I am.
4  Q  Are you licensed in any other states?
5  A  In the District of Columbia.
6  Q  Do you know Mr. John Lee?
7  A  I know him as the, I guess, owner/operator
8  of Level X stores.
9  Q  Have you ever had any conversations with
10 Mr. Lee?
11 A  As relates to?
12 Q  As relates to the Prince George's Plaza
13 plans for the retail store for Level X.
14 A  Yes, I've probably had a couple, a couple or
15 three conversations with him which date back to the
16 time of my involvement, which I guess was during the
17 Summer of 2002.
18 Q  Do you recall the first time you had any
19 communication with Mr. Lee?
20 A  Yes. I received a call from him.
21 Q  And do you have an idea of what time frame
22 that might have been?

**10**

1  A  Only to say during the Summer of 2002,
2  possibly July, somewhere in there.
3  Q  Okay. That's fine.
4     And what was the, can you -- what was
5  discussed in that first phone call?
6  A  He informed me that -- actually, I'd like to
7  mention that his call was a follow-up call to a prior
8  call. I was contacted by the mall management at
9  Prince George's Plaza, and the mall management
10 informed me that they had a tenant who was a current
11 tenant who was going to be relocating to another space
12 in that mall, and that this tenant, whom I later found
13 out to be John Lee, needed some assistance in permit
14 services, and then he said, Mr. Lee, the mall
15 management said Mr. Lee will be contacting you. And
16 then I got a call from Mr. Lee.
17 Q  Do you recall the name of the person from
18 mall management?
19 A  It might have been Mr. Anthony Yancy.
20 Q  So the mall management person told you that
21 John Lee would be calling you, and then John Lee
22 called you. And could you explain what occurred in

**11**

1  that first contact?
2  A  Mr. Lee informed me, as best as I can
3  recall --
4  Q  Sure.
5  A  -- that he had some plans, that he was
6  endeavoring to get a building permit from Prince
7  George's County, DER, I guess, which stands for
8  Department of Environment or Resources, or something
9  like that. They informed him that he needed to have
10 his plans reviewed and sealed by an architect, and
11 that's what he informed me of, that's what he
12 requested of me, and that's what he asked if I had the
13 capability of doing. I said possibly, I guess we can
14 see what you have. And that was the nature of our
15 first conversation.
16 Q  And then did you have another conversation
17 with Mr. Lee after that first conversation?
18 A  The only other conversation that I recall --
19 and, again, it was probably just a couple of
20 conversations, and for semantics purposes, a couple
21 means a couple or three.
22 Q  Umh-humh.

**12**

1  A  I remember that we scheduled to meet so that
2  he could show me, you know, the space in the
3  particular mall. And that would probably have been
4  our second conversation at the space, at the tenant
5  space.
6  Q  And so you met Mr. Lee at the tenant space?
7  A  Right. A day or two later, correct.
8  Q  Okay. And what occurred at that meeting?
9  A  The meeting was attended by, I forget his
10 name, but someone, a general contractor, it was
11 attended by John Lee, and I was there. And I recall
12 that they showed me, you know, what their goal was,
13 which is to build out the space. At that point the
14 space had been, I guess you would call it, selectively
15 demolitioned or demolished, or whatever; it's
16 basically when it's taken down to a raw shell
17 condition. So that's what I saw, and that's pretty
18 much the nature of our second conversation.
19 Q  Did Mr. Lee or anyone on behalf of Level X
20 at that meeting ask you to provide a specific service
21 for Level X with regard to that store?
22 A  Well, it was just a continuation of the

## Page 17

1  pursuant to satisfying your PG/DER permit application/
2  revalidation only for the Level X space in PG Plaza."
3       Then back to the text, the actual typed
4  text, quote: "Level X" - again in Mr. Johns' voice on
5  behalf of Level X - "Level X, Incorporated agrees to
6  indemnify you and your consulting engineer, G.I.
7  Worsley and to provide you with legal representation
8  and support, at no cost to you, relative to any claim
9  made against you and/or your consulting engineer by
10 the previous architect. Thank you for your
11 assistance. Sincerely, Christopher M. Johns." That's
12 the content of the letter.
13      MS. WESTERVELT: Okay. Could we get this
14 labeled Exhibit 1 please?
15      (Deposition Exhibit No. 1 was marked for
16 identification and was attached to the transcript.)
17 BY MS. WESTERVELT:
18   Q   The typed date on here is July 23rd, and
19 then it looks like your handwritten changes are July
20 25th; is that correct?
21   A   According to this, yes, it does look like
22 it's handwritten in there, 7/25/02.

## Page 18

1    Q   Okay. At the meeting that you had at Prince
2  George -- at the store space, did you receive the
3  plans at that time to review?
4    A   I don't recall that I received the plans at
5  that time.
6    Q   Do you recall when you received them?
7    A   It possibly was a day or two later.
8    Q   And who gave them to you?
9    A   It possibly was the guy from -- the general
10 contractor, again, whose name I don't remember. It
11 may have been Mr. Lee, although I'm kind of fuzzy in
12 that area.
13   Q   And what did you do after you were given the
14 plans?
15   A   I took the plans, I reviewed them, and after
16 I was completed with the review, after I determined in
17 my opinion that the plans, you know, conformed to the
18 building codes and there were adequate means of
19 egress -- I mean, in a retail space it's very, it's
20 very straightforward, basically you have a box, you
21 have an entrance doorway, and you have a couple of
22 emergency egress or secondary doorways to get out of

## Page 19

1  the place, you have to have exit signs there or
2  emergency battery pack lights, just enough to make
3  sure that if there's a power failure the patrons or
4  employees can see their way to the exit, and there's
5  usually a bathroom or something. That was typical for
6  this store. It was a very straightforward, just a big
7  box store, as many retails stores are now, and they're
8  just basically pretty much dressed out with racks of
9  merchandise, and that's the case with this store, it
10 was pretty much a box. So I was able to determine in
11 my opinion that the plans seemed to be in conformity
12 with what I, you know, know code requirements to be.
13      At that point I signed and sealed the plans,
14 but I put a superscription or subscription, I either
15 wrote it above or beneath my seal on the plan, it said
16 for permit review only or for permit purposes only,
17 something like that, and I affixed my signature, my
18 initial signature thereto.
19   Q   How long did that review take, roughly?
20   A   I probably was able to turn it around in a
21 day or two.
22   Q   And then who did you return the drawings to?

## Page 20

1    A   I do recall meeting with -- I'm sorry. The
2  record, I'm sure, will reflect whatever his name was,
3  but the general contractor.
4    Q   Could it have been Ron Rees?
5    A   That sounds familiar, and I gave the plans
6  back to him.
7    Q   Okay. Time frame-wise, based on the dates
8  that we have in front of us on this letter, would that
9  review of the plans have preceded this letter, or
10 would that review have come after this letter?
11   A   That's -- in my, in my recollection, it may
12 have been somewhat overlapping and concurrent.
13 Because this letter, as you see, represents my edits,
14 or my comment on a draft by Level X's representative
15 or attorney. I don't have a recollection as to
16 whether or not I received this in its final form. I
17 can't recall.
18   Q   Do you recall if you ever received this in
19 its final form?
20      MR. JOHNS: Asked -- already answered.
21      MS. WESTERVELT: No.
22   Q   Is this the final form, is this exhibit the

DEPOSITION OF JEFFREY IVAN WAY
CONDUCTED ON WEDNESDAY, JUNE 25, 2003

6 (Pages 21 to 24)

Page 21

1  final form of this letter?
2     A   I have -- I do not recall seeing it in its
3  final form where my language was added into the typed.
4     Q   That's my question.
5     A   Right.
6     Q   Okay. When John Lee asked you to provide
7  this service, did he tell you that Level X owned the
8  drawings?
9     A   That was my understanding, yes.
10    Q   And was it your understanding because of
11 something that Mr. Lee said or someone else from Level
12 X said?
13    A   Well, when I looked at the drawings they
14 seemed to exhibit, in my opinion, you know, ownership.
15 I did not see anywhere in the plans when I was
16 reviewing them, I didn't see anything that expressed
17 that the plans were not owned by the national brand.
18 You see, the premise under which I understood this
19 product was at -- Level X is a national brand
20 retailer, like, quote/unquote, old Navy or The Gap or
21 The Limited or something, or McDonald's.
22    Q   Umh-humh.

Page 22

1     A   And through my own knowledge of working with
2  or knowing about the workings of those national brands
3  is that they have a variety of plan preparers;
4  sometimes they have plan preparers that are in-house,
5  like their own in-house CADD draftsman or architects
6  or engineers and staff; sometimes they do what we say,
7  quote/unquote, farm the drawings out to a variety of
8  plan preparers. And I presumed, based on, you know,
9  their bringing the plans to me and that Level X was
10 very large in terms of, you know, its typeface or the
11 lettering on the cover page, and it seemed to me that
12 they were their plans. I mean, I didn't question that
13 they were not their plans.
14    Q   Did you have -- did you ever have any
15 conversations with John Lee or anyone else, any other
16 representative of Level X about Michael Hackley, the
17 architect, the original architect on those plans?
18    A   The only thing I recall about Michael
19 Hackley, to the best of my recollection, is that he
20 was not able to provide the signature and seal or
21 whatever. I, I didn't have very, very much
22 information on that at all. I just -- you know, I

Page 23

1  accepted their representation that the plans were
2  theirs. I -- my impression was that he was a plan
3  preparer, but...
4     Q   Did you question Level X regarding Michael
5  Hackley and why they needed you to sign and stamp the
6  drawings and not Michael Hackley?
7     A   No, not really. Because the premise under
8  which it came to me, I think I may have made an
9  assumption that since Prince George's County had asked
10 them to have these plans prepared, I presume that they
11 had presented the plans, whatever, without a sealed
12 signature, I guess I presumed that they reviewed the
13 plans, looked at them or whatever, and said, listen,
14 we need to get an architect to sign and seal these. I
15 just presumed that that was, you know, the quote/
16 unquote, order of the day, to get that accomplished.
17    Q   The statement in here that was typed, and
18 you added a couple words to the sentence that says:
19 "Level X, Inc., agrees to indemnify you and your
20 consulting engineer and to provide you with legal
21 representation and support, at no cost to you,
22 relative to any claim made against you by the previous

Page 24

1  architect," and you inserted "and/or your consulting
2  engineer."
3     A   Okay.
4     Q   What does that sentence mean to you? Did
5  you -- well, let me ask you that. What did that
6  sentence mean to you?
7     A   Well, again --
8     Q   That specific sentence.
9     A   Right. Again, under a scenario where I'm
10 reviewing plans that are prepared by somebody else, or
11 drafted, whatever the case, you know, if there is a
12 problem with the plans, with the technical content of
13 the plans, you know, I wanted it very clear that I'm
14 reviewing these in response to Prince George's
15 County's direction and request for code conformity
16 only. If is there -- my purpose was that if there was
17 any problems with technical content, that I'm not
18 responsible for technical content. If something goes
19 wrong in the construction process, if something gets
20 built wrong, wires get cut, or if in the course of
21 cutting through the slab a reinforcing rod, I just
22 wanted it as clear as possible that my role is to sign

**Page 25**

1  and seal the plans pursuant to satisfying PG/DER's
2  permit process.
3      Q   And with regard to pursuant to satisfying
4  the PG/DER permit application, where did you obtain
5  your knowledge that PG/DER was requiring these plans
6  to be signed and sealed for permit purposes?
7      MR. JOHNS: Objection as to the
8  characterization "required." Go ahead, you can
9  answer.
10     A   The plans were -- the project was presented
11 to me. The question was presented to me by Level X.
12 I accepted their representation that the plans were
13 theirs, Prince George's County has asked for this, and
14 that's why I did it.
15     Q   Okay. This letter says for the flat fee of
16 twelve hundred dollars. Were you paid twelve hundred
17 dollars for this service?
18     A   Yes, I was.
19     Q   And after, after you signed and sealed the
20 drawings and handed them back to Mr. Rees, you think,
21 someone from Commercial Finish Group, and you were
22 paid, did you ever provide any more services for Level

**Page 26**

1  X?
2      A   No.
3      MS. WESTERVELT: I think that's all the
4  questions I have.
5      MR. JOHNS: Just --
6      MS. WESTERVELT: Thank you very much.
7      MR. JOHNS: -- two questions.
8  EXAMINATION BY COUNSEL FOR THE DEFENDANTS LEE AND WAY
9  BY MR. JOHNS:
10     Q   Mr. Way, what, if any, copyright markings
11 that one would typically see did you see on the plans,
12 do you recall?
13     A   I don't recall seeing any particular or
14 explicit, you know, references of copyright. You mean
15 the tie-back to the previous plan preparer?
16     Q   Well, like a "C" or anything like that. Do
17 you recall? You don't seeing that, do you?
18     A   No, I do not.
19     Q   Okay. You testified you received twelve
20 hundred dollars, but out of this whole occurrence
21 isn't it true that it actually cost you twenty-five
22 hundred dollars?

**Page 27**

1      A   It's cost me more than that.
2      Q   More than that?
3      A   Yes, sir.
4      Q   All right. So you haven't profited from any
5  of this, have you?
6      A   No, I have not profited from this, by no
7  stretch of the imagination.
8      MR. JOHNS: Thank you.
9      MS. WESTERVELT: One more question, then.
10 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
11 BY MS. WESTERVELT:
12     Q   Mr. Johns asked you didn't it cost you
13 twenty-five hundred dollars, and you said yes, it cost
14 you more than that. Could you explain that response?
15     A   Yes. The -- Mr. Hackley filed a complaint
16 with the State of Maryland Board of Registrars or
17 Architects, and he brought a complaint against me for
18 reviewing and sealing plans that I did not prepare.
19 And the Board of Architects queried me, they
20 interviewed me through their process. I informed them
21 of what I've informed you of today, and I was
22 interested in getting this matter resolved quickly.

**Page 28**

1  It's stressful. And they generated a, what is called
2  a Consent Order and they fined me, and I paid the
3  fine. Because I had no intention of doing anything
4  wrong.
5      MS. WESTERVELT: Excuse me. Mr. Johns,
6  that's very disturbing to whisper while your client is
7  speaking.
8      MR. JOHNS: Excuse me.
9      MS. WESTERVELT: I'm sorry. Could you read
10 back his last two sentences?
11     (Answer was read by the Reporter.)
12     MR. JOHNS: Just let the record reflect that
13 I was not whispering to the witness. I was talking to
14 his counsel -- another attorney in the room.
15     A   And I wanted to get the matter settled as
16 quickly as possible.
17     Q   Sure. Then one other question as a
18 follow-up to Mr. John's question about the copyright
19 notice. Do you put the copyright notice on the plans
20 that you create yourself?
21     A   Yes, I do. It depends on the nature of it.
22 For example, if I'm doing it -- if someone has hired